CALVIN K. KAWAMOTO, aka Cal Kawamoto, on his own behalf and on behalf of the members of the Waipahu Neighborhood Board and the members of the Waipahu Business Association, Petitioner, v. RUSSELL OKATA, ANNETTE YAMAGUCHI, REYNALDO GRAULTY, ROBSON HIND, JOY LEWIS, RICHARD OSHIRO, LINDA SMITH, ELWIN L. SPRAY, DODGE WATSON, and RAYMOND K. PUA, Respondents

NO. 15903

JANUARY 12, 1994

LUM, C.J.,* MOON, KLEIN, LEVINSON, JJ., AND INTERMEDIATE COURT OF APPEALS CHIEF JUDGE BURNS, ASSIGNED BY REASON OF VACANCY

*Chief Justice Lum, who heard oral argument in this case, retired on March 31, 1993. *See* HRS § 602–10 (1985).

464

## OPINION OF THE COURT BY KLEIN, J.

Petitioner Calvin Kawamoto seeks a writ of mandamus, pursuant to article III, chapter 1, section 3–103, paragraph 5, of the Revised Charter of the City and County of Honolulu (RCH) (Supp. 1990),[1] compelling the members of the 1991 Council Reapportionment Committee for the City and County of Honolulu (Committee) to rescind their reapportionment plan in lieu of a new plan that divides the area around the town of Waipahu into no more than two council districts. Following the adoption of the final reapportionment plan by the Committee, Kawamoto filed this petition arguing that the Committee abused its discretion by selecting a final plan that divided the Waipahu area among three council districts.

---

[1] Article III, chapter 1, section 3–103, paragraph 5, of the Revised Charter of the City and County of Honolulu (RCH) provides in pertinent part that "[a]ny registered voter may petition the proper court to compel, by mandamus or otherwise, the appropriate person or persons to perform their duty of [sic] to correct any error made in a reapportionment plan."

## I. **Facts**

Pursuant to the RCH article III, chapter 1, section 3–103 (Supp. 1990),[2] the Committee was charged with reapportioning the nine Honolulu city council districts for the 1994 council elections.

At its second meeting, the Committee's legal counsel explained various legal requirements, including the principle of "one person/one vote." In addition to the requirements of the RCH, the Committee's own criteria provided that any deviation of district voters from the average number of voters per district was to be kept as low as possible, and that voter confusion with regard to balloting and voting procedures was to be avoided. Insofar as practicable given the deviation criterion, the Committee also sought to avoid the splitting of communities when establishing council district boundaries.

The Committee considered two reapportionment plans designated KP–1 and SD–1. After four public hearings, the Committee voted 8–0 in favor of the KP–1 plan that started at Kaena Point and proceeded clockwise around the island, dividing Oahu into nine council districts.[3] (*See* appendix.) The Committee filed its final report and reapportionment plan on December 23, 1991. Kawamoto, claiming that the leeward community of Waipahu was unlawfully split among three different council districts, brought this petition for a writ of

---

[2] RCH article III, chapter 1, section 3–103 provides in pertinent part that "[t]he year 1991 and every tenth year thereafter shall be reapportionment years."

[3] Kaena point was chosen because of its mountainous nature and sparse population. These features provide an ideal starting point for reapportionment.

mandamus. Kawamoto complains that the KP–1 plan illegally dilutes the voting power of Waipahu's residents, causes great confusion for the average voter, and favors some or all incumbent council members.

## II. Discussion
### A. Writ of Mandamus

A writ of mandamus is "an extraordinary remedy which [this court] will not issue unless the petitioner demonstrates (1) a clear and indisputable right to relief and (2) a lack of other means to adequately redress the wrong or obtain the requested action." *Breiner v. Takao*, 73 Haw. 499, 502, 835 P.2d 637, 640 (1992). Kawamoto's application implicates the original jurisdiction of this court, and his equal protection argument presents a question of law. Therefore, there is no standard of review. *Pray v. Judicial Selection Comm'n*, 75 Haw. 333, 340, 861 P.2d 723, 727 (1993). The subject matter of this writ also concerns the discretionary acts of a public body regarding whether the reapportionment plan is compact and contiguous, confuses the average voter, or favors incumbents. We measure the Committee's actions in light of these arguments using the abuse of discretion standard of review. *Kaiser Foundation Health Plan, Inc. v. Department of Labor & Indus. Relations*, 70 Haw. 72, 81, 762 P.2d 796, 801 (1988); *Hoopii v. Sinclair*, 40 Haw. 452, 458 (1954).

### B. Compact and Contiguous

Kawamoto's first contention is that the new council districts are not "compact" in violation of the committee's

own criteria (criteria),[4] RCH, article II, chapter 1, section 3–103, subsection 3(b),[5] and article IV, section 6, subsection 4 of the Hawai'i Constitution (1978).[6] Kawamoto claims that the specific language of these provisions prevents the Committee from splitting communities, like Waipahu, among several council districts. We disagree.

The language of the criteria and the RCH do not require that *communities* remain undivided or compact, but instead reference *council districts.* No evidence has been presented to show that the council districts created by the reapportionment plan are not sufficiently compact or contiguous.[7] The fact that Waipahu is divided among

---

[4] One of the Committee's criteria specifically states, "Districts, insofar as practicable, shall be contiguous and compact."

[5] Article II, chapter 1, section 3–103, subsection 3(b) of the Honolulu City and County Charter provides in pertinent part, "Districts, insofar as practicable, shall be contiguous and compact."

[6] Article IV, section 6, subsection 3 of the Hawai'i Constitution (1978) provides, "districts shall be contiguous." Article IV, section 6, subsection 4 of the Hawai'i Constitution (1978) provides, "Insofar as practicable, districts shall be compact." Although facially similar to the language provided in the committee's criteria and the RCH, these provisions concern the apportionment of districts of the state legislature, not city council districts.

[7] Beyond their literal meanings, there is no exact legal definition of nor test for "compact and contiguous." Instead, reapportionment plans that do not meet these requirements normally fail because there is evidence of an intent to discriminate. Districts that are not compact and contiguous will generally be evident from their appearance. *See Shaw v. Reno*, 113 S. Ct 2816, 125 L. Ed. 2d 511, 61 U.S.L.W. 4818 (1993); *Karcher v. Daggett*, 462 U.S. 725 (1983). Thus, reapportionment plans with irregularly shaped districts or with numerous finger like extensions may evidence a lack of compactness and contiguity. *See Daggett*, 462 U.S. at 755 (Stevens, J., concurring). Justice Stevens, in his concurring opinion, discusses some of the mathematical methods

several districts is irrelevant to the issue whether the districts are contiguous and compact. Examining the maps and evidence in the record, we find that the reapportionment plan does not violate the "contiguous and compact" legal requirement, and Kawamoto's arguments to the contrary are unpersuasive.

Even if it were a goal of reapportionment to protect individual communities, there is no clear description of the "Waipahu community." Unlike other states where town boundaries may be mapped and defined, there are no explicit divisions separating Waipahu from other neighboring areas that may or may not be considered part of Waipahu. Thus, it is debatable whether developing areas like Village Park,[8] Seaview, and Waipio should be included within the "Waipahu community." Identifying an exact Waipahu community and determining what areas may or may not be divided by reapportionment lines would be at best immensely difficult and probably impossible. Furthermore, it would be equally difficult to utilize a "community interest" standard as the basis for reapportioning more densely populated, yet unbounded areas such as Kalihi, Makiki, and Kaimuki while holding to the one person–one vote principle. The lack of defined

---

for computing compactness. *Id.* at 756–57 n.19 (Stevens, J., concurring). He notes that while many states have compact and contiguous requirements, the standards have been of "limited utility because they have not been defined and applied with rigor and precision." *Id.* at 756 (Stevens, J., concurring).

[8] If Village Park is not included in the definition of the "Waipahu community," Waipahu would only be divided between two council districts, a result Kawamoto concedes would be acceptable. Given the record before us, we question whether Village Park is part of the town of Waipahu.

boundaries precludes reapportionment based upon a strict recognition of community interests.

## C. Equal Protection

Kawamoto next claims that the reapportionment plan violates the due process and equal protection rights of Waipahu's voters by invalidly dividing Waipahu and diluting its voting power. Because of the heterogeneous nature of the class of "Waipahu voters," we do not believe that "Waipahuans" make up a group that is subject to special protection under the Equal Protection Clause.[9]

The Equal Protection Clause of the United States Constitution "requires that a State make an honest and good faith effort to construct districts . . . as nearly of equal population as is practicable." *Reynolds v. Sims*, 377 U.S. 533, 577 (1964). Although generally analyzed in the context of racial groups, the Constitution protects "voting rights and political groups . . . as well as economic units, racial communities, and other entities." *Karcher v. Daggett*, 462 U.S. 725, 749 (1983) (Stevens, J., concurring) (citing *Williams v. Rhodes*, 393 U.S. 23, 39 (1968) (Douglas, J., concurring));[10] *see also Reynolds*,

---

[9] This case is unlike those cases cited by the parties. In the opinions of the United States Supreme Court, parties attacking a reapportionment plan often complain that district deviations are too large, resulting in a dilution of their voting power. As will be discussed, Kawamoto argues that the Committee had the leeway to reapportion districts with greater population deviations thereby leaving Waipahu intact. Kawamoto does not, however, claim that the deviations in the present reapportionment are invalid. Lacking improper deviations, Kawamoto's equal protection claim must rely, if at all, upon the mistreatment of an identifiable group.

[10] In *Daggett*, the majority opinion examined New Jersey's reapportionment plan by scrutinizing the percentage differences in population

377 U.S. at 560–61 ("equal representation for equal numbers of people, without regard to race, sex, economic status, or place of residence within a State.").

> If [the rules governing elections] serve no purpose other than to favor one segment — whether racial, ethnic, religious, economic, or political — that may occupy a position of strength at a particular point in time, or to disadvantage a politically weak segment of the community, they violate the constitutional guarantee of equal protection.

*Daggett*, 462 U.S. at 748 (Stevens, J., concurring). In his concurring opinion, Justice Stevens added that actions based upon equal protection require that:

> [a]s a threshold matter, plaintiffs must show that they are members of an identifiable political group whose voting strength has been diluted. They must first prove that they belong to a politically salient class . . . whose geographical distribution is sufficiently ascertainable that it could have been taken into account in drawing district boundaries.

*Id.* at 754 (Stevens, J., concurring). "The mere fact that a number of citizens share a common ethnic, racial, or religious background does not create the need for protection against gerrymandering. It is only when their common interests are strong enough to be manifested in political action that the need arises." *Id.* at 750 (Stevens, J., concurring).

---

in each district. Justice Stevens's concurring opinion stressed the need to look beyond the mere numerical differences, and examine the intent and effect of the reapportionment.

> The mere fact that one interest group or another concerned with the outcome of [the] elections has found itself outvoted and without legislative seats of its own provides no basis for invoking constitutional remedies where, as here, there is no indication that this segment of the population is being denied access to the political system.

**Whitcomb v. Chavis**, 403 U.S. 124, 154–55 (1971).

In support of his equal protection claim, Kawamoto cites **Klahr v. Williams**, 339 F. Supp. 922 (D. Ariz. 1972), which invalidated Arizona's reapportionment plan because it violated the equal protection rights of Navajo Indians by improperly dividing the Navajo Indian Reservation. The evidence showed that the reservation was divided among various districts at the demand of incumbent legislators.[11] *Id.* at 927. The court found that the division was improperly made "in order to destroy the possibility that the Navajos . . . might be successful in electing one or more of their own choices to the Legislature." *Id.*[12]

---

[11] The reservation was originally within a single district until an incumbent House member who resided in the district insisted that the plan be amended and the reservation divided among three legislative districts. **Klahr**, 339 F. Supp. at 927.

[12] The *Klahr* court also found, however, that the lack of compactness of the overall plan came not from invidious intent, but from a reasonable decision of the reapportionment committee to begin apportioning districts at the corners of the state and work towards the center. The overall plan was "based on logical justification and, perhaps, necessity even though it had the result that adjustments had to be made in the interior legislative districts at the expense of compactness." *Id.* at 926. As discussed, there is no evidence of a lack of compactness of the districts in the instant case.

Kawamoto argues that the Committee's reapportionment plan destroys the possibility that Waipahu might elect a "Waipahuan" to the city council. Unlike other gerrymandering cases, however, there is no recognized protectable group in the instant case.[13] Kawamoto admits that Waipahu is a heterogeneous "community" containing a range of racial, political, and socio–economic groups, and he has failed to show that area voters would have sufficiently common interests that would be manifested in political action. *See Daggett*, 462 U.S. at 750 (Stevens, J., concurring). Thus, Kawamoto's equal protection claim must fail for lack of an identifiable political group whose homogenous interests might be the subject of illegal discrimination. We refuse to sustain the gerrymandering claims of a nebulous group of citizens with diverse socio–economic and political backgrounds.

Furthermore, we find no evidence of invidious purpose. The Committee's decision to start at Kaena point and work clockwise was a logical choice and well within the discretionary powers of the Commission. Nothing in the record evidences an improper motive by any of the members of the Committee. The lack of invidious intent or purpose further blunts Kawamoto's constitutional claims. We conclude that the reapportionment plan was sufficiently supported by the Committee's decision to minimize the deviation between districts and enforce the one person/one vote principle to the greatest extent possible.

---

[13] As previously discussed, it is difficult, if not impossible, to identify exactly where the community of Waipahu begins and ends. The lack of identifiable boundaries weakens Kawamoto's equal protection argument because the premise of any equal protection claim is that an identifiable class of voters has been or will be discriminated against.

## D. **District Deviations**

Kawamoto next argues that the Committee had the leeway to keep Waipahu intact with only a slightly higher deviation among council districts, citing cases that allowed reapportionment plans to have higher deviations in order to facilitate other purposes. Generally, the "one person–one vote" goal requires a state to make a good faith effort to construct districts "as nearly of equal population as is practicable." *Reynolds*, 377 U.S. at 577. Courts have recognized, however, that exact equality is impossible and "hardly a workable constitutional requirement." *Id.*

In *Mahan v. Howell*, 410 U.S. 315 (1973), a Virginia plan created a maximum deviation of 16.4 percent. The United States Supreme Court validated the plan, allowing more flexibility in the interest of the normal functioning state and local governments. *Id.* at 324–25. The Court stated, "[t]he policy of maintaining the integrity of political subdivision lines in the process of reapportioning a state legislature . . . is a rational one." *Id.* at 329. In *Brown v. Thomson*, 462 U.S. 835 (1983), the Wyoming reapportionment plan had a maximum deviation of 89 percent and an average deviation of 16 percent. The United States Supreme Court held that the deviation was a result of the consistent and nondiscriminatory application of the state policy of preserving the county boundaries, assigning one legislative seat for each county. The Court stated "as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within [the] category of minor deviation" and that does not make out a prima facie case of invidious discrimination. *Brown*, 462 U.S. at 842. The

Court found that the greater deviation in the case of Wyoming was sufficiently justified by the state's goals.

Kawamoto claims that the Committee could have kept the Waipahu community together and stayed within a legally tolerable deviation.[14] Although Kawamoto's argument has some merit, the Committee was not required to maximize the deviation in order to avoid dividing any particular geographic area. It is illogical to criticize the Committee by claiming that it abused its discretion in dividing the Waipahu area in order to achieve a *lower* deviation. Furthermore, unlike Virginia and Wyoming, Honolulu does not have a historical policy of using community boundaries for redistricting. Thus, the Committee did not err in selecting a reapportionment plan that minimized district deviations to the greatest extent feasible.

### E. Voter Confusion and Incumbent Favoritism

Kawamoto next argues that the reapportionment plan causes confusion for the average registered voter in violation of the criterion that states, "When and where possible consideration should be given to eliminate all possible confusion . . . for the average registered voter." Kawamoto argues that the average voter would be confused by the reapportionment plan because he or she might be represented by a city councilmember represent-

---

[14] Here, Kawamoto argues the other side of his previous claims. When opposing the splitting of Waipahu, he argued that the division illegally diluted Waipahu's voting power. However, for purposes of this argument, he claims that the voting power of other districts should have been further diluted by creating a greater deviation. He cannot have it both ways.

ing the leeward area and a state legislator representing central Oahu. We do not believe that the reapportionment plan causes any confusion or violates the criteria and conclude that Kawamoto's contention is meritless.

Finally, Kawamoto argues that the reapportionment plan favors one or more incumbent councilmembers to the detriment of Waipahu's residents in violation of the criteria, the RCH, and the State Constitution. Specifically, Kawamoto points to the fact that all but one of the new council districts have incumbent councilmembers. This result, without more, does not evidence any improper action on the part of the Committee. Nor does this fact support the argument that any councilmember was favored over another or that the majority political party acted to the detriment of the minority party. This case is unlike *Klahr*, where the committee amended the plan at the request of an incumbent without further explanation. Kawamoto has presented no evidence that the Committee even considered the incumbents' interests and has failed to present sufficient evidence for us to conclude that the Committee favored any incumbent or acted improperly.

## III. Conclusion

Kawamoto has failed to demonstrate that he has a clear and indisputable right to relief warranting the issuance of a writ of mandamus to the Committee. The Committee's decision to choose the challenged reapportionment plan was discretionary, and there is no evidence that the Committee abused its discretion or acted in an arbitrary or capricious manner. The equal protection attack mounted by Kawamoto as a basis for dismissing

the reapportionment plan fails to convince us that the plan offends the constitutional guidelines.

The writ of mandamus is denied.

*Roy Y. Kawamoto* (*Calvin K. Kawamoto*, pro se, on the briefs) for petitioners.

*Christopher A. Diebling*, Deputy Corporation Counsel, for respondents.

478

Honolulu City Council District Plan

Honolulu City Council District Plan

CITY & COUNTY OF HONOLULU
1991 REAPPORTIONMENT
HONOLULU CITY COUNCIL