2003 ME 81

**In re 2003 LEGISLATIVE APPOR-
TIONMENT OF the HOUSE OF
REPRESENTATIVES.**

Supreme Judicial Court of Maine.

Argued: June 11, 2003.
Decided: July 2, 2003.

David A. Lourie, Esq. (orally), 189 Spurwink Avenue, Cape Elizabeth, for Green Independent Party et al.

Douglas R. Johnson (orally), Stonington.

G. Steven Rowe, Attorney General, Paul Stern, Deputy Attorney General (orally), William R. Stokes, Deputy Attorney General, Melissa Reynolds O'Dea, Asst. Attorney General, Christopher C. Taub, Asst. Attorney General, Augusta.

Gerald F. Petruccelli, Esq. (orally), Petruccelli, Martin & Haddow, LLp, Portland, for Maine Democratic Party et al.

Panel: SAUFLEY, C.J., and
CLIFFORD, RUDMAN, DANA,
ALEXANDER, CALKINS, and LEVY,
JJ.

SAUFLEY, Chief Justice.

[¶ 1] As is required by the Maine Constitution, the 121st Maine Legislature undertook the reapportionment of the House of Representatives in. January 2003. Ultimately, a reapportionment plan was approved by the House and the Senate and was signed into law by Governor John E. Baldacci on April 15, 2003. Two challenges were filed with the Supreme Judicial Court, one challenging the plan's composition of the Portland area districts, including Districts 114, 115, 117, and 120, and the other challenging the plan's composition of District 36, comprising several towns and islands in Hancock and Knox Counties. We conclude that the Legislature's plan complies with both constitutional and statutory requirements, and we do not sustain the challenges.

## I. BACKGROUND

[¶ 2] Pursuant to Article IV, Part First, Section 2 of the Maine Constitution, "[t]he Legislature which convenes in 1983 and every 10th year thereafter shall cause the State to be divided into districts for the choice of one Representative for each district." Accordingly, in January 2003, the 121st Legislature established a bipartisan Apportionment Commission to consider the composition of the Maine House of

Representatives.[1] *See* ME. CONST. art. IV, pt. 3, § 1–A.[2] The Commission heard from members of the public and reviewed various plans. *See id.* Because the population of the State of Maine had changed both regionally and as to total population over the last ten years,[3] the Commission was required to change the existing districts to comply with constitutional requirements of population parity.

[¶ 3] In April 2003, the Commission submitted its plan for redistricting the House of Representatives to the full Legislature.[4] *See id.* art. IV, pt. 1, § 3. The House accepted that plan by passing L.D. 1555, "An Act to Reapportion the House Legislative Districts" by the required two-thirds votes on April 10, 2003. *See id.* The Senate passed the House Plan by the required two-thirds votes on April 15, 2003. *See id.* The House Plan was finally approved and signed by Governor Baldacci on April 15, 2003, as required by the Maine Constitution. *See id.; id.* art. IV, pt. 3, § 2; P.L.2003, ch. 44.

[¶ 4] The Green Independent Party, the Cumberland County Green Independent Party, and two individual citizens, Mary L. Donnelly and Benjamin Meiklejohn (collectively referred to as the Portland challengers), filed a challenge to the House Plan, contending that, with regard to the Portland districts, the plan fails to satisfy the compactness and contiguity requirements mandated by the Maine Constitution in House Districts 114, 115, 117, and 120. ME. CONST. art. IV, pt. 1, § 2; *see also* 21–A M.R.S.A. § 1206–A (Supp.2002).

1. The Commission also considered the apportionment of the State Senate, and Maine's United States Congressional districts, neither of which is at issue here.

2. ME. CONST. art. IV, pt. 3, § 1–A states, in pertinent part,:

 A Legislature which is required to apportion the districts of the House of Representatives ... under Article IV, Part First, Section 2 ... shall establish, within the first 3 calendar days after the convening of that Legislature, a commission to develop in accordance with the requirements of this Constitution, a plan for apportioning the House of Representatives ...

 The commission shall be composed of 3 members from the political party holding the largest number of seats in the House of Representatives, who shall be appointed by the Speaker; 3 members from the political party holding the majority of the remainder of the seats in the House of Representatives, who shall be appointed by the floor leader of that party in the House; 2 members of the party holding the largest number of seats in the Senate, who shall be appointed by the President of the Senate; 2 members of the political party holding the majority of the remainder of the seats in the Senate, to be appointed by the floor leader of that party in the Senate; the chairperson of each of the 2 major political parties in the State or their designated representatives; and 3 members from the public generally, one to be selected by each group of members of the commission representing the same political party, and the third to be selected by the other 2 public members. The Speaker of the House shall be responsible for organizing the commission and shall be chairperson pro tempore thereof until a permanent chairperson is selected by the commission members from among their own number. No action may be taken without a quorum of 8 being present. The commission shall hold public hearings on any plan for apportionment prior to submitting such plan to the Legislature.

3. The United States Census Bureau reports that there were 1,227,928 people living in Maine in 1990. By 2000, that number had increased by 46,995 (or 3.8%) to 1,274,923. The Court notes that the population of the State has shifted south with the largest population increase (of 13.5%) occurring in York County and the largest population decrease (of 15%) occurring in Aroostook County.

4. The Commission failed to agree on a plan for reapportioning the State Senate but did submit a plan for apportionment of the United States Congressional districts that ultimately failed to pass in the Legislature.

The Portland challengers argue that the districts were unusually shaped and were created to avoid incumbent election match-ups, at the expense of the only State Representative of the Green Independent Party.

[¶ 5] The second challenge was presented by Douglas R. Johnson, who challenges the House Plan's treatment of District 36 (comprising islands and towns in Hancock and Knox Counties). Mr. Johnson contends that the configuration of the district violates the compactness and contiguity requirements of the Maine Constitution. Johnson alleges that District 36 is not compact because travel among the island communities therein requires extensive travel by car or boat, and that District 36 is not contiguous because the communities are separated by large stretches of water.

[¶ 6] The Department of the Attorney General (representing the Legislature), the Maine Democratic Party, the Speaker of the House, Patrick Colwell, and House Republican Leader, Joseph Bruno, assert that the House Plan satisfies all constitutional requirements. Specifically, they state that the primary goal of the plan was to realign districts according to population shifts. In addition, the plan was devised to minimize incumbent election match-ups, to use major roads as boundaries, and, whenever possible, to maintain communities of interest.

## II. DISCUSSION

### A. Jurisdiction

■ [¶ 7] Although the challenges come to the Court in a posture that is similar initially to that of an appeal, the Maine Constitution provides that we address this as an original action. "The Supreme Judicial Court shall have original jurisdiction to hear any challenge to an apportionment law enacted by the Legislature, as regis-tered by any citizen or group thereof. If any challenge is sustained, the Supreme Judicial Court shall make the apportionment." ME. CONST. art. IV, pt. 1, § 3. All challengers and supporters of the House Plan were invited to present written argument, and to submit maps and other population and geographical information. A public hearing was held at which the various positions were presented.

### B. Standard of Review

■ [¶ 8] When the Legislature reaches agreement on a decennial reapportionment, the resulting law establishing the new districts is entitled to a strong presumption of validity. *See In re 1983 Legislative Apportionment of House, Senate, & Cong. Dists.*, 469 A.2d 819, 827 (Me.1983). The Legislature is the branch of government that is required in the first instance to reconcile traditional state policies within the constitutional mandates governing the reapportionment of state legislative and United States Congressional districts. *Id.* A duly enacted apportionment plan is not rendered unconstitutional because a resourceful challenger, or a court, can create a better plan. *See id.* at 828. Accordingly, the pivotal question is not whether the Legislature enacted the best plan, but whether the enacted plan is constitutional. *Id.*

■ [¶ 9] The challengers have a heavy burden of demonstrating that the apportionment is unconstitutional. *See id.* at 830. We will not alter the Legislature's chosen apportionment unless the Legislature failed to comply with constitutional norms, *see Karcher v. Daggett*, 462 U.S. 725, 740, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), or was motivated by impermissible discriminatory intent in making the compromises necessary to harmonize state and

federal standards, *In re 1983 Legislative Apportionment,* 469 A.2d at 827.

## C. Population Parity

[¶ 10] The foremost principle guiding reapportionment is the requirement that each person receive equal access to representation. *See Chapman v. Meier,* 420 U.S. 1, 22, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975). Any apportionment plan must comply with Federal Constitutional mandates, including the "one person, one vote" principal of the Equal Protection Clause of the Fourteenth Amendment. *See id.* at 23, 95 S.Ct. 751 (acknowledging "that some leeway in the equal population requirement should be afforded states in devising their legislative reapportionment plans"). Thus, state legislatures must " 'make an honest and good faith effort to construct districts . . . as nearly of equal population as is practicable.' " *In re 1983 Legislative Apportionment,* 469 A.2d at 826 (quoting *Reynolds v. Sims,* 377 U.S. 533, 577, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)).

[¶ 11] Here, the challengers have not contested the population deviations of the districts. Similarly, the challengers have not presented an equal protection challenge or a claim that the House Plan inappropriately crosses political subdivision lines. *See* U.S. CONST. amend. XIV;

ME. CONST. art. IV, pt. 1, § 2. D. Contiguity and Compactness

[¶ 12] In essence, all of the challenges are state-law claims based on the requirements of contiguity and compactness. The Maine Constitution provides that:

> *Each Representative District shall be formed of contiguous and compact territory and shall cross political subdivision lines the least number of times necessary to establish as nearly as practicable equally populated districts.*

ME. CONST. art. IV, pt. 1, § 2 (emphasis added).[5]

For purposes of the Commission's apportionment efforts, "[f]unctionally contiguous and compact territory" is defined by statute as follows:

> *"functionally contiguous and compact territory" is one that facilitates representation by minimizing impediments to travel within the district.* Impediments to travel include, but are not limited to, physical features such as mountains, rivers, oceans and discontinued roads or lack of roads. The commission shall recognize that all political subdivision boundaries are not of equal importance and give weight to the interests of

5. The Maine Constitution describes the composition of the House of Representatives as follows:

> The House of Representatives shall consist of 151 members, to be elected by the qualified electors, and hold their office 2 years from the day next preceding the first Wednesday in December following the general election. The Legislature which convenes in 1983 and every 10th year thereafter shall cause the State to be divided into districts for the choice of one Representative for each district. The number of Representatives shall be divided into the number of inhabitants of the State exclusive of foreigners not naturalized according to the latest Federal Decennial Census or a State Census previously ordered by the Legislature to coincide with the Federal Decennial Census, to determine a mean population figure for each Representative District. Each Representative District shall be formed of contiguous and compact territory and shall cross political subdivision lines the least number of times necessary to establish as nearly as practicable equally populated districts. Whenever the population of a municipality entitles it to more than one district, all whole districts shall be drawn within municipal boundaries. Any population remainder within the municipality shall be included in a district with contiguous territory and shall be kept intact.
>
> ME. CONST. art. IV, pt. 1, § 2.

local communities when making district boundary decisions.

21–A M.R.S.A. § 1206–A (Supp.2002) (emphasis added). With this background, we address each challenge in turn.

### 1. Portland–Area Districts

 [¶ 13] The Portland challengers first argue that the House Plan maximized representation of voters in a Democratic stronghold by ensuring that current Democratic incumbents reside in separate districts (Districts 117 and 115) and by placing a "jog" in the boundary line in Deering Center, thereby effectively preventing any match-up between Democratic incumbents. We conclude that this challenge does not rise to the level of a constitutional or statutory violation.[6] Apportionment legislation does not become invalid because it takes into account political considerations or is politically motivated. *See Davis v. Bandemer*, 478 U.S. 109, 138–39, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (plurality opinion) (disagreeing with the analysis that "the intentional drawing of district boundaries for partisan ends and for no other reason violates the Equal Protection Clause in and of itself"); *Gaffney v. Cummings*, 412 U.S. 735, 752–53, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) ("[I]t would be idle, we think, to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it.... The reality is that districting inevitably has and is intended to have substantial political consequences."); *Burns v. Richardson*, 384 U.S. 73, 89, n.

16, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966) ("The fact that district boundaries may have been drawn in a way that minimizes the number of contests between present incumbents does not in and of itself establish invidiousness."); *In re Legislative Districting of the State*, 370 Md. 312, 805 A.2d 292, 297 (2002) (concluding that if a plan does not violate constitutional requirements, the fact that it was formulated "to preserve communities of interest, to promote regionalism, to help or injure incumbents or political parties, or to achieve other social or political objectives, will not affect its validity"); *In re Reapportionment of Hartland*, 160 Vt. 9, 624 A.2d 323, 337 (1993) ("As long as constitutional and statutory criteria regarding redistricting are adhered to ... creating districts to avoid contests between incumbents is a legitimate consideration....").

 [¶ 14] Next, although they acknowledge that the House Plan places the residents of Portland's islands within District 114 in order to bring the population of District 120 into constitutional tolerances, the Portland challengers argue that the change has been made at the expense of the contiguity and compactness of those districts. Specifically, the Portland challengers object to the House Plan's placement of 1012 residents of the Portland Islands in District 114, rather than in District 120, which they assert is closer by mileage, and contains a public transportation link, thereby creating a contiguity problem.

---

6. The Portland challengers contend that there has been unconstitutional gerrymandering. To prevail on a claim of gerrymandering, however, the Supreme Court has held that challengers are "required to prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." *Davis v. Bandemer*, 478 U.S. 109, 127, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (plurality opinion). Thus, "even if a state legislature redistricts with the specific intention of disadvantaging one political party's election prospects, we do not believe that there has been an unconstitutional discrimination against members of that party unless the redistricting does in fact disadvantage it at the polls." *Id.* at 139, 106 S.Ct. 2797. Here, the challengers have not demonstrated such discrimination.

[¶ 15] We agree with the Supreme Court of Virginia when it noted that:

> [w]hile ease of travel within a district is a factor to consider when resolving issues of compactness and contiguity, resting the constitutional test of contiguity solely on physical access within the district imposes an artificial requirement which reflects neither the actual need of the residents of the district nor the panoply of factors which must be considered by the [Legislature] in the design of a district. Short of an intervening land mass totally severing two sections of an electoral district, there is no per se test for the constitutional requirement of contiguity. Each district must be examined separately.

*Wilkins v. West,* 264 Va. 447, 571 S.E.2d 100, 109 (2002).

[¶ 16] In this case, the Legislature attempted to reconcile the competing requirements as outlined by the Federal and State Constitutions and State statutes, and we will only invalidate the plan if "access is unreasonable, unduly burdensome, or adversely impacts the ability of residents to secure meaningful representation of their interests or effective communication with their elected representative." *Id.* at 110; *see also In re 1983 Legislative Apportionment,* 469 A.2d at 831.

[¶ 17] Although residences on islands present transportation challenges, the Portland islands are contiguous to nearly all parts of Portland's shoreline; the choice of connecting the islands by district to one peninsula rather than the other is not irrational; and there is no indication in the record that the island residents are unable to travel to and from Portland or that the House Plan hinders their access to meaningful representation.

2. The District 36 Challenge

[¶ 18] Challenger Johnson argues that although the towns and island communities within District 36 may be situated in close proximity, travel between these communities can be difficult. District 36 includes the Hancock County towns of Brooklin, Deer Isle, Frenchboro, Stonington, Swans Island, Tremont, and portions of Mount Desert, and the Knox County towns of Isle au Haut, North Haven, and Vinalhaven. Johnson argues that on a map the distance from Vinalhaven to Isle au Haut is less than fifteen miles but that, by car, the trip covers over ninety miles and requires two ferry trips. Therefore, he asserts that District 36 is not compact.

[¶ 19] Furthermore, Johnson argues that large bodies of water separate many of the towns in District 36. While acknowledging that District 36 is technically contiguous, he argues that the Constitution requires close proximity between the towns within the district.

[¶ 20] Although we agree that District 36 may pose transportation challenges for its representative, those challenges are within what is constitutionally permissible under the state compactness-and-contiguity test when the special nature of islands is considered. Indeed, the shape of the district is more compact than many others. It is only when the issue of transportation across the water is taken into account that the additional demands on the representative become apparent.[7] Those demands are inherent in most of the districts that incorporate one or more of the dozens of inhabited islands along the Maine coast. Although they may be more significant in District 36, the district has existed in much

---

7. Johnson concedes that District 36 "may have been considered 'compact' when the major means of transportation was by boat."

the same shape for at least ten years, and we find no constitutional or statutory violation in its configuration.

## III. CONCLUSION

[¶ 21] As we held in 1983, the "Legislature is not obligated to adopt the best apportionment plans conceivable, but only ones that comply with both the federal and the state constitutions." *In re 1983 Legislative Apportionment*, 469 A.2d at 831. Our authority is limited to determining whether or not the Legislature's plan for the House of Representatives comports with constitutional requirements. We conclude that the House Plan complies with constitutional and statutory mandates even though the plan may not have satisfied all constituencies. In so finding, we repeat our admonition that "[w]e shall not intervene in the apportionment process unless we are convinced that the Legislature failed to use proper judgment or was in fact motivated by impermissible discriminatory intent in making the compromises necessary to harmonize state and federal standards." *Id.* at 827. The challengers have failed to overcome the presumption of constitutionality that precedent requires us to attach to the redistricting plan. *See id.*

[¶ 22] Having considered the constitutional mandates, statutory provisions, and arguments of the parties, we conclude that the House Redistricting Plan enacted as P.L.2003, ch. 44 meets constitutional and statutory standards and, therefore, we do not sustain the challenges.