KINGMAN PARK CIVIC
ASSOCIATION, et al.,
Appellants,

v.

Anthony A. WILLIAMS,
et al., Appellees.

No. 04–CV–954.

District of Columbia Court of Appeals.

Argued Nov. 15, 2005.

Decided May 10, 2007.

Frazer Walton, Washington, DC, with whom Steven W. Teppler, was on the brief, for appellants.

John R. Hoellen, Assistant General Counsel for the Council of the District of Columbia, with whom Charlotte Brookins-Hudson, General Counsel for the Council of the District of Columbia, were on the brief, for appellants.

Stacy L. Anderson, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General, at the time the brief was filed, and Edward E. Schwab, Deputy Attorney General, at the time the brief was filed, were on the brief, for appellees.

Before REID, GLICKMAN, and KRAMER, Associate Judges.

KRAMER, Associate Judge:

The appellants appeal from the trial court's order granting a Motion to Dismiss

for Failure to State a Claim or, in the Alternative, for Summary Judgment on their Complaint that the Ward Redistricting Amendment Act of 2001 ("Redistricting Act"), codified at D.C.Code § 1–1041.03 (2001), which reconfigured the eight election wards in the District of Columbia, violates the redistricting standards set forth in the District of Columbia Election Act, D.C.Code § 1–1011.01 (2001) ("D.C. Election Act"). We affirm the trial court's order.

## I.

Appellants, the Chevy Chase Civic Association and the Kingman Park Civic Association (hereinafter referred to as the "Associations"),[1] filed suit in the Superior Court against the District of Columbia, the Mayor in his official capacity and the individual members of the Council of the District of Columbia in their official capacities (hereinafter referred to collectively as the "District of Columbia") after their communities were split between Wards 3 and 4 and Wards 6 and 7, respectively, by the redistricting process. The Council passed the Redistricting Act on June 19, 2001, setting out the new Ward boundaries, and it became effective on October 2, 2001. The redistricting process was in response to the 2000 federal decennial census, which revealed that the District of Columbia had undergone a significant demographic shift since the previous electoral wards were

established.[2] Several plans were proposed and considered before the final redistricting scheme was enacted.

Before bringing their suit in the Superior Court, the Associations had filed a similar case in the United States District Court for the District of Columbia, challenging the validity of the Redistricting Act based on violations of § 2 of the federal Voting Rights Act, 42 U.S.C. § 1973, and, in addition, asserting D.C. Election Act claims. Concluding that the Associations had failed to state a claim upon which relief could be granted under § 2 of the federal Voting Rights Act, the District Court dismissed the suit pursuant to Fed. R.Civ.P. 12(b)(6) and declined to exercise pendant jurisdiction over the Associations' D.C. Election Act claims. *Kingman Park Civic Ass'n v. Williams,* No. 01–2675(GK), 2002 U.S. Dist. Lexis 15254 (D.D.C.2002).

The Associations appealed that ruling, and the United States Court of Appeals for the District of Columbia Circuit, although rejecting the District Court's conclusion that the Associations had failed to state a claim, affirmed the District Court's judgment of dismissal on the alternative ground that the Mayor and Council were entitled to summary judgment pursuant to Fed.R.Civ.P. 56(c). *Kingman Park Civic Ass'n v. Williams,* 358 U.S.App.D.C. 295, 348 F.3d 1033 (2003). (*Kingman II*). In reaching that judgment, the Circuit looked to the three predicate conditions set forth by the Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92

---

1. In the complaint, the appellants defined their neighborhoods as follows: Kingman Park is located in Northeast Washington, D.C., and is "bounded on the north by the Langston Golf Course and M Street, NE, on the west by 15th Street and Bladensburg Road, on the south by East Capitol Street, and on the east by the Anacostia River"; Chevy Chase is in Northwest Washington D.C., and "extend[s] from the area of Military Road to Connecticut Avenue, NW."

2. According to the original count of the U.S. Census Bureau, the District's overall population had decreased by 34,841 people from 1990 to 2000. Specifically, the eastern portion of the District experienced a population drop while the western portion, Wards 1, 2, and 3 in particular, had grown. After 2000, only seven of the eight electoral wards had permissible population deviations according to the Election Act, D.C.Code § 1–1011.01(f).

L.Ed.2d 25 (1986), that are necessary to make out a prima facie case of vote dilution under Section 2 of the Voting Rights Act:

1. That the minority group in question is "sufficiently large and geographically compact to constitute a majority in a single-member district";

2. That the minority group is "politically cohesive"; and

3. That the "majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate."

*Kingman II, supra,* at 358 U.S.App.D.C. at 303–04, 348 F.3d at 1041–42.

The Circuit Court noted that the Associations had "not alleged that African American voters in Ward Six or Ward Three are politically cohesive or that Ward Six or Ward Three is characterized by racially polarized voting," nor had the Associations "submitted affidavits or any other evidence supporting such a conclusion." *Kingman II, supra,* at 358 U.S.App.D.C. at 304–05, 348 F.3d at 1042–43. Having determined that the District was entitled to summary judgment on the sole federal claim properly before the court, the Circuit Court affirmed the District Court's dismissal of the pendent D.C. Election Act claims.

While their federal claims were pending appeal before the Circuit, the Associations brought the instant suit in the Superior Court alleging that the District's Redistricting Act violated the D.C. Election Act. The District of Columbia filed a motion to dismiss for failure to state a claim or, in the alternative, for summary judgment. The trial court granted the motion,[3] finding: (1) the wards under the Redistricting Act were sufficiently "compact and contig-

uous" because "a resident can reasonably access all portions of the election district[s] ... without leaving the district," (2) "[t]here is no absolute requirement that census tracts not be split," (3) the Associations could not sustain their claim that minority votes were diluted because they did "not show[ ] [that the District of Columbia was] motivated by a racially discriminatory purpose," and (4) there was "no authority for the proposition that failing to fall within [the Council's Subcommittee on Labor, Voting Right and Redistricting]'s target range [which was less than the statutory dictate of 10%] results in violation of the statute." The trial court also held that the Associations were not collaterally estopped by the federal proceedings from bringing their claims in the Superior Court because the District Court had only addressed the federal Voting Rights Act and not the Election Act claims.

## II.

The Associations now argue that the trial court erred in granting the District's motion by rejecting their various claims: first, that the boundaries of the District of Columbia's eight electoral wards established under the Redistricting Act are not sufficiently compact or contiguous and do not respect natural boundaries as required by the D.C. Election Act, D.C.Code § 1–1011.01 (2001); second, that the Redistricting Act violates the Election Act by splitting two census tracts, in violation of § 1–1011.01(e) of the Act; and third, that the Redistricting Act divides the African–American population between wards in a fashion that has the purpose and effect of diluting minority votes, in violation of § 1–1011.01(g) of the Act.[4]

---

**3.** In so doing, the trial court did not distinguish between those claims that were dismissed for failure to state a claim and those claims on which summary judgment was granted.

**4.** We note that the Associations conceded that they could not establish their fourth claim, that is, that the Redistricting Act resulted in election wards that were not "approximately

■ "We review a 'dismissal for failure to state a claim *de novo*,'" *Washkoviak v. Student Loan Marketing Ass'n (Sallie Mae)*, 900 A.2d 168, 177 (D.C.2006) (quoting *Oparaugo v. Watts*, 884 A.2d 63, 75 (D.C.2005)), and will affirm a dismissal only if "'it is beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief.'" *Oparaugo, supra*, 884 A.2d at 75 (quoting *Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559, 562 (D.C. 2002)). Likewise, we also review the grant of summary judgment *de novo Tobin v. John Grotta Co.*, 886 A.2d 87, 89 (D.C. 2005) (citing *Joyner v. Sibley Mem'l Hosp.*, 826 A.2d 362, 368 (D.C.2003)), to ensure that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Allen v. Yates*, 870 A.2d 39, 44 (D.C.2005) (quoting Super. Ct. Civ. R. 56(c)).

The Election Act establishes requirements that the Council must fulfill in creating electoral wards.[5] Pertinent here are its requirements that the wards be divided "into 8 compact and contiguous election wards, each of which shall be approximately equal in population size," D.C.Code § 1–1011.01(c); that the population deviation range of the wards not be greater than 10% and not be greater than 5% from the average ward population of 71,507, except where necessary to promote "a rational public policy, including … respect for the political geography of the District, *the natural geography of the District*, neighborhood cohesiveness, *or the development of compact and contiguous districts*," D.C.Code § 1–1011.01(f) (emphasis added); that the boundaries of the wards "shall conform to the greatest extent possible with the boundaries of the census tracts that are established by the United States Bureau of the Census," D.C.Code § 1–1011.01(e); and that the redistricting plan not have "the purpose and effect of diluting the voting strength of minority citizens," D.C.Code § 1–1011.01(g). In reviewing the trial court's order, we must determine whether the districts, as redrawn, violated the dictates of the Election Act.

■ We review interpretation of a statute *de novo. Robert Siegel, Inc. v. District of Columbia*, 892 A.2d 387, 393 (D.C. 2006) (citing *Richardson v. Easterling*, 878 A.2d 1212, 1216 (D.C.2005)). In doing so, we "look to the plain meaning of [the] statute first, construing words according to their ordinary meaning." *Mesa v. United States*, 875 A.2d 79, 89 (D.C.2005) (quoting *Boyle v. Giral*, 820 A.2d 561, 568 (D.C. 2003)); *see Crescent Props. v. Inabinet*, 897 A.2d 782, 786 (D.C.2006) (quoting *Peoples Drug Stores, Inc. v. District of Co-*

---

equal in population size," as mandated by § 1–1011.01(c) of the Act, since the law merely requires that the population of the eight wards not deviate more than 5% from the average ward population of 71,507, or more than 10% from the population of any other ward, and they were unable to make such a showing. Indeed, the claim was based not on the Election Act, but on an aspirational goal set by the Council's Subcommittee on Labor, Voting Rights and Redistricting, which was to bring the population of the wards after redistricting within a 1.5% deviation of each other.

5. The Election Act also requires the Mayor and the D.C. Board of Elections and Ethics to report the results of the federal decennial census within ten days of receiving that information, D.C.Code § 1–1011.01(a)(1), "provide the Council with technical and analytical services necessary for decennial redistricting," D.C.Code § 1–1011.01(a)(2), and make that information accessible to the public, D.C.Code § 1–1011.01(a)(3). The Act additionally stipulates that the census statistics are the only permissible population data upon which redistricting can be based. D.C.Code § 1–1011.01(d).

*lumbia,* 470 A.2d 751, 753 (D.C.1983)). Those words "are to be read in the light of the statute taken as a whole, and are to be given a sensible construction and one that would not work an obvious injustice." *Siegel, supra,* 892 A.2d at 393 (quoting *Columbia Plaza Tenants' Ass'n v. Columbia Plaza L.P.,* 869 A.2d 329, 332 (D.C.2005)). "In appropriate cases, we also consult the legislative history of a statute." *Crescent, supra,* 897 A.2d at 786 (quoting *Abadie v. District of Columbia Contract Appeals Bd.,* 843 A.2d 738, 742 (D.C.2004)). Moreover, we must always bear in mind the important principle that electoral redistricting is primarily the responsibility of the legislature and is not a judicial function. *See League of United Latin American Citizens v. Perry,* — U.S. —, ——— ——, 126 S.Ct. 2594, 2607–09, 165 L.Ed.2d 609 (2006); *Easley v. Cromartie,* 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001); *In re Legislative Districting of the State,* 370 Md. 312, 805 A.2d 292, 321 (2002).

### A.

■ We address first the Associations' argument that the trial court erred in rejecting their claim that the new electoral districts are not compact and contiguous, and do not respect the natural boundaries of the Anacostia River and Rock Creek Park because Ward 4 "stretches across Rock Creek Park," and Ward 7 "now extends across the Anacostia River." As an initial matter, we note that the Election Act does not mandate that respect for natural boundaries be a prevailing concern in redistricting, but rather it is simply a factor that can be used to justify a greater deviation from equal population of wards. *See* D.C.Code § 1–1011.01(f). Moreover, while the Election Act directs that the electoral wards be "compact and contiguous," it does not define those terms. *See* D.C.Code § 1–1011.01(c). Although we have not yet had the occasion to interpret "compact and contiguous" as used in our statute, other jurisdictions' treatment of similar statutory and state constitutional requirements are useful to our analysis.

In evaluating compactness, many courts have held that the term relates to the physical shape and size of the district,[6] and some jurisdictions have specifically concluded that compact districts are not necessarily required to coincide with natural barriers.[7] Numerous other courts have

---

6. *See In re Reapportionment of the Colorado General Assembly,* 647 P.2d 191, 193 (Colo. 1982) ("Compactness as used in the [state] constitutional sense .... concerns a geographic area whose boundaries are as nearly equidistant as possible from the geographic center of the area ....") (quoting *Acker v. Love,* 178 Colo. 175, 496 P.2d 75, 76 (1972)); *Kawamoto v. Okata,* 75 Haw. 463, 868 P.2d 1183, 1186 n. 7 (1994) ("[R]eapportionment plans with irregularly shaped districts or with numerous finger like extensions may evidence a lack of compactness and contiguity."); *Mellow v. Mitchell,* 530 Pa. 44, 607 A.2d 204, App. A at 216 (1992) ("[T]he criterion of compactness and contiguity involves visual inspection of a graphic presentation of the shape of a congressional district...."); *Kilbury v. Franklin County,* 151 Wash.2d 552, 90 P.3d 1071, 1077 (2004) (defining compactness to mean "as regular in shape as possible");

*see also In re 2001 Redistricting Cases,* 44 P.3d 141, 143 (Alaska 2002) (holding that "a bizarrely-shaped appendage" violated the compactness requirement for redistricting). *But see Wilson v. Eu,* 1 Cal.4th 707, 4 Cal.Rptr.2d 379, 823 P.2d 545, 553 (1992) ("Compactness does not refer to geometric shapes but to the ability of citizens to relate to each other and their representatives and to the ability of representatives to relate effectively to their constituency."); *Parella v. Montalbano,* 899 A.2d 1226, App. A at 1252 (R.I.2006) ("[C]ompactness ... refer[s] to something more than mere geography.").

7. *See In re Legislative Districting of the State,* 370 Md. 312, 805 A.2d 292, 297 (2002) ("[D]istricts need not be exactly equal in population or perfectly compact and they are not absolutely prohibited from crossing natural or political subdivision boundaries, since they

recognized the difficulty in achieving perfectly compact districts when redistricting and have imposed a reasonableness standard when judging compactness.[8] In addition, many jurisdictions have defined *contiguous* electoral districts as those that are physically connected.[9]

must do so if necessary for population parity...."); *In re Reapportionment of Towns of Hartland, Windsor & W. Windsor,* 160 Vt. 9, 624 A.2d 323, 345 (1993) ("The [challenged] district is geographically compact and contiguous, but separated by a mountain range. There is road access between Richford and the rest of the district."); *Wilkins v. West,* 264 Va. 447, 571 S.E.2d 100, 110 (2002) ("While far from the most compact district, and containing a small portion that is contiguous only by water, nothing in this record indicates that the District is repugnant to the constitutional principles of compact and contiguous electoral districts.").

8. *See Beaubien v. Ryan,* 198 Ill.2d 294, 260 Ill.Dec. 842, 762 N.E.2d 501, 506 (2001) ("[P]erfect or maximum compactness is not required. Districts need only be 'reasonably compact.' "); *In re Legislative Districting of the General Assembly,* 193 N.W.2d 784, 790 (Iowa 1972) ("[T]he requirement of compactness must be construed to mean as compact as practicable, having proper regard for equality of population between the several districts."); *Preisler v. Kirkpatrick,* 528 S.W.2d 422, 426 (Mo.1975) (holding that compactness requirement was not breached because "the Commission made an honest and good faith effort to construct senatorial districts as compact as may be"); *Davenport v. Apportionment Comm'n,* 65 N.J. 125, 319 A.2d 718, 722–23 (1974) ("Compactness is an elusive concept.... It would appear that a plan with more compact districts could be prepared. However, that is not the only test to be applied here."); *Schneider v. Rockefeller,* 31 N.Y.2d 420, 340 N.Y.S.2d 889, 293 N.E.2d 67, 72–73 (1972) ("[T]he requirement of compactness is a practical one.... [A]lthough we would agree that some of the challenged districts are, to say the least, irregular in form, none are so aggravated or outrageous as would warrant the conclusion that the Legislature has completely departed from the constitutional standard."); *Commonwealth ex rel. Specter v. Levin,* 448 Pa. 1, 293 A.2d 15, 24 (1972) ("[C]ompactness of Legislative districts must be evaluated objectively and with allowance for the elements of unavoidable noncompactness."); *Wilkins, supra,* 571 S.E.2d at 110; *see also Kawamoto, supra,* 868 P.2d at 1186 n. 7 ("Beyond their literal meanings,

there is no exact legal definition of nor test for 'compact and contiguous.' ").

9. *See Wright v. Schoenberger,* 262 F.Supp.2d 156, 158 (S.D.N.Y.2003) (defining contiguous territory as that which is "touching, adjoining and connected, as distinguished from territory separated by other territory") (quoting *Sherill v. O'Brien,* 188 N.Y. 185, 81 N.E. 124, 131 (1907)); *Arizona Minority Coal. for Fair Redistricting v. Arizona Indep. Redistricting Comm'n,* 211 Ariz. 337, 121 P.3d 843, 869 (Ct.App.2005) (" 'Contiguity' refers to the geographic connection uniting the entirety of a district. A district that is geographically separated is not contiguous." (citations omitted)); *In re Constitutionality of House Joint Resolution 25E,* 863 So.2d 1176, 1179 (Fla.2003) ("This Court has defined 'contiguous' as 'being in actual contact: touching along a boundary or at a point.' A district lacks contiguity 'when a part is isolated from the rest by the territory of another district' or when the lands 'mutually touch only at a common corner or right angle.' " (quoting *In re Apportionment Law, Senate Joint Resolution 1 E,* 414 So.2d 1040, 1051 (Fla.1982)) (citations omitted)); *In re 2003 Legislative Apportionment,* 827 A.2d 810, 815–16 (Me.2003) (quoting *Wilkins, supra,* 571 S.E.2d at 109); *In re Legislative Districting of the State,* 370 Md. 312, 805 A.2d 292, 320 (2002) ("[C]ontiguous territory is territory touching, adjoining and connected, as distinguished from territory separated by other territory."); *Le Roux v. Secretary of State,* 465 Mich. 594, 640 N.W.2d 849, 853 (2002) ("Areas that meet only at points of adjoining corners are not contiguous."); *Below v. Gardner,* 148 N.H. 1, 9 (2002) ("Courts generally agree that contiguous territory is territory that touches, adjoins or is connected, as distinguished from territory that is separated by other territory."); *Albert v. 2001 Legislative Reapportionment Comm'n,* 567 Pa. 670, 790 A.2d 989, 993 n. 5 (2002) ("[A] contiguous district [i]s 'one in which a person can go from any point within the district to any other point [within the district] without leaving the district,' or one in which 'no part of the district is wholly physically separate from any other part.' " (quoting *Specter, supra,* 293 A.2d at 23)); *Wilkins, su-*

■ We need not now define compact or contiguous as those terms are used in the Election Act because the Associations have not established that under generally accepted standards either Wards 3 and 4 or Wards 6 and 7 fall outside of the acceptable parameters. The fact that Wards 3 and 4 now traverse Rock Creek Park and Wards 6 and 7 now traverse the Anacostia River does not render them noncompact or noncontiguous. As the trial court found, "a resident can reasonably access all portions of the election district[s] . . . without leaving the district"; and "neither Rock Creek Park nor the Anacostia River is an impenetrable barrier that cannot be readily traversed in a matter of minutes" by the roads through the Park and across the River. Moreover, the trial court noted that each ward covers a defined regular area and is not disjointed or divided by other pieces of land. In any event, compactness and contiguity of an electoral district are only two of the many statutory factors that the Council took into consideration when redistricting, and since this is an inherently legislative function, we will not disrupt its legislative compromise in the absence of demonstrable evidence inconsistent with the statutory scheme. *See Easley, supra*, 532 U.S. at 242, 121 S.Ct. 1452. The challenged wards, as redrawn, fall well within the precedent examining what is reasonably "compact and contiguous." Thus we affirm the trial court's ruling on this claim.

### B.

■ The Associations next argue that the Redistricting Act violates the

Election Act by unnecessarily splitting census tract 14.01 between Wards 3 and 4 and census tract 68.04 between Wards 6 and 7. No evidence was presented below, however, to show that the legislature did not "conform to the greatest extent possible with the boundaries of the census tracts." *See* D.C.Code § 1–1011.01(e). In any event, as with "compact and contiguous," conformity to census tracts is only one of several factors the Council must take into consideration when redistricting electoral wards, and we defer to its legislative determination in weighing these concerns. *See Easley, supra*, 532 U.S. at 242, 121 S.Ct. 1452. The fact is that, out of the numerous census tracts in the District of Columbia, the Associations here contest the splitting of only two, which, if anything, would appear to support an effort by the Council to adhere to the census tracts "to the greatest extent possible." We thus conclude that the trial court did not err in ruling that this claim could not go forward.

### C.

■ Third, the Associations contend that the Redistricting Act dilutes the voting strength of African–American voters, contrary to the dictates of the Election Act, because they allege the predominantly African–American neighborhood of Kingman Park was split between Wards 6 and 7 and the African–American community residing in Chevy Chase was divided between Wards 3 and 4. Like § 2 of the federal Voting Rights Act, 42 U.S.C. § 1973, *see Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481–82, 117 S.Ct. 1491,

---

*pra*, 571 S.E.2d at 109 ("Short of an intervening land mass totally severing two sections of an electoral district, there is no *per se* test for the constitutional requirement of contiguity. Each district much be examined separately."); *Preisler, supra*, 528 S.W.2d at 424 n. 4 (finding contiguity because "no part of any district is physically separate from any other

part"); *Specter, supra*, 293 A.2d at 23 ("A contiguous district has been defined as 'one in which a person can go from any point within the district to any other point [within the district] without leaving the district,' or one in which 'no part of the district is wholly physically separate from any other part.'" (footnotes omitted)).

137 L.Ed.2d 730 (1997), the Election Act disallows redistricting plans that have "the *purpose and effect* of diluting the voting strength of minority citizens." D.C.Code § 1–1011.01(g) (emphasis added).

As discussed above, *supra* at 981–82, in *Gingles,* the Supreme Court set out factors to examine in evaluating claims brought under the Voting Rights Act, that is, whether there is a geographically compact minority that constitutes a majority, is politically cohesive, and whose preferred candidate will be defeated in the absence of special circumstances by a white majority that votes as a block. 478 U.S. at 50–51, 106 S.Ct. 2752 (citations omitted); *see Perry, supra,* 126 S.Ct. at 2613–14 (2006). The Associations did not make such allegations in their complaint nor did they provide sufficient evidence of this to raise a genuine issue of fact. Super. Ct. R. Civ. P. 56(c). Thus, the trial court did not err in rejecting this claim.

 Moreover, we note also that the issue of whether the redistricting scheme had a "discriminatory effect" was specifically addressed in the District Court action, where the same plaintiffs sued the same defendants as in this case, asserting that the redistricting plan violated the Voting Rights Act, and that issue was resolved against them. The Circuit affirmed that decision, concluding that the Associations had not sufficiently established discriminatory effect pursuant to the *Gingles* standard for their federal Voting Rights Act claim. *See Kingman II, supra,* 358 U.S.App. D.C. at 298, 348 F.3d at 1036.

 Because the issue of the discriminatory effect of the District's redistricting plan was specifically resolved in the District Court case, we conclude that collateral estoppel now bars the Associations' vote dilution challenge.[10] Otherwise referred to as issue preclusion, collateral estoppel "precludes the relitigation of factual or legal issues decided in a previous proceeding and essential to the prior judgment." *Borger Mgmt. v. Sindram,* 886 A.2d 52, 59 (D.C.2005) (citing *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Oubre v. District of Columbia Dep't of Employment Servs.,* 630 A.2d 699, 703 (D.C.1993)). Collateral estoppel applies in situations where

> the issue in the new case [is] one that was actually litigated and decided in the prior case, by a final and valid disposition on the merits, after a full and fair opportunity for litigation by the same parties or their privies, where the issue was necessarily decided in disposing of the first action, and not mere dictum.

*Major v. Inner City Prop. Mgmt., Inc.,* 653 A.2d 379, 382 (D.C.1995) (quoting *Smith v. Jenkins,* 562 A.2d 610, 617 (D.C. 1989)). Because the Associations' vote dilution claim was fully litigated and decided on its merits as a dispositive issue by the D.C. Circuit Court, we hold that collateral estoppel bars its relitigation in this case, brought under the Redistricting Act.[11]

In any event, as did the trial court, we also conclude that the Associations have not made the requisite showing of discrim-

---

10. *See, e.g., Chevalier v. Moon,* 576 A.2d 722, 724 (D.C.1990) ("[T]his court may affirm a decision for reasons other than those given by the trial court.") (quoting *Garrett v. Washington Air Compressor Co.,* 466 A.2d 462, 464 n. 5 (D.C.1983)).

11. Both parties have provided this court with statistics relating to the percentage of African–Americans in each ward, measured ac-

cording to both total population and voting age population. Because we hold that the Associations' vote dilution claim is precluded by collateral estoppel, and, in any event, the trial court denied the dilution claim for failure to make the requisite showing of discriminatory purpose and did not address its discriminatory effect, we do not consider these statistics in reaching our decision.

inatory purpose on their vote dilution claim. The Redistricting Act's legislative history reveals that the Council considered several different plans from diverse sources. Its job was to reconcile the concerns of residents throughout the District, not just in Kingman Park or Chevy Chase, in making its ultimate redistricting determination. The resulting statute represents a legislative compromise, well-documented in the legislative history, from which no discriminatory purpose can be inferred.[12] Because the Associations did not adequately establish either discriminatory effect or purpose, the trial court properly granted summary judgment on the vote dilution claim.

For the reasons stated herein, we conclude that the Associations have failed to show that the trial court erred in dismissing and granting summary judgment on their claims. Accordingly, the trial court's order is hereby

*Affirmed.*

12. The Associations have alleged that, in drafting the Redistricting Act, the City Council avoided splitting Chinatown into separate wards but decided to split Kingman Park instead, thereby demonstrating the intent to pack minority votes into Ward 6. This evidence, with nothing more, is insufficient to show discriminatory purpose.