120 P.3d 217

**CITIZENS FOR EQUITABLE AND RE-SPONSIBLE GOVERNMENT, a Hawai'i nonprofit corporation; Brenda J. Ford; Stanley A. Boren; Floyd H. Lundquist; Marlene E. Lundquist; Ronald C. Phillips, Plaintiffs–Appellants**

and

**Beverly Byouk and Sandra W. Scarr, Plaintiffs–Appellees**

v.

**COUNTY OF HAWAI'i; County Clerk, County Of Hawai'i; Lloyd Van de Car, Chairman, County of Hawai'i 2001 Reapportionment Commission, Defendants–Appellees.**

No. 25614.

Supreme Court of Hawai'i.

July 22, 2005.

As Corrected July 28, 2005.

As Amended on Reconsideration in Part Sept. 22, 2005.

Michael J. Matsukawa, on the briefs, for plaintiffs-appellants.

Patricia K. O'Toole, Deputy Corporation Counsel, County of Hawai'i, on the briefs, for defendants-appellees.

LEVINSON, ACOBA, and DUFFY, JJ.; with NAKAYAMA, J., concurring separately and dissenting, with whom MOON, C.J., joins.

## Opinion of the Court by ACOBA, J.

We hold that (1) the phrase "equal resident populations" in section 3–17(f)(4) of the Charter of the County of Hawaii (the Charter) excludes nonresident college students and nonresident military personnel and their dependents from the population base for purposes of reapportioning county council districts of the County of Hawai'i, (2) a total deviation in excess of 10% in an electoral reapportionment plan presents a prima facie case of discrimination in violation of the equal protection clause of the United States Constitution, (3) a rational government policy will justify a total deviation that slightly exceeds the 10% threshold, and (4) assuming, in excluding nonresident students and nonresident military personnel and their dependents from the population base, the plan of the County of Hawaii 2001 Reapportionment Commission (the Commission) resulted in a total deviation of 10.89%, such a deviation in this unique instance (a) was minimal, (b) apparently included the Commission's consideration of other valid criteria under section 3–17 of the Charter, (c) resulted from the commission's intent to achieve inclusiveness and equal representation, and (d) was, therefore, constitutional.

## I.

Pursuant to the Charter, Defendant–Appellee County of Hawai'i initiated a reapportionment of its county council districts in 2001. The Commission was appointed and confirmed in accordance with a provision in the Charter requiring that in 1991, and every tenth year thereafter, a commission be established to determine the boundaries of council districts, and to file a reapportionment plan by December 31 of those years.[1] A series of public meetings and hearings was held throughout Hawai'i County, during which private speakers argued that the Commission was using the wrong population base and

---

1. Section 3–17 of the Charter under which the Commission acted states as follows:

> (a) There shall be a county reapportionment commission which shall establish the boundaries of the council districts.
>
> (b) The initial reapportionment commission shall consist of seven members, two of whom shall be residents of the combined judicial districts of North and South Hilo, one from the judicial district of Puna, one from the judicial district of Kau, one from the combined judicial districts of North and South Kona, one from the combined judicial districts of North and South Kohala, and one from the judicial district of Hamakua. The members shall be appointed by the mayor and confirmed by the council in the manner prescribed in section 13–4.
>
> (c) Each subsequent reapportionment commission shall consist of nine members. One member shall be a resident of each council district as established by the previous reapportionment commission. The members shall be appointed by the mayor and confirmed by the council in the manner prescribed in section 13–4.
>
> (d) *The year 1991 and every tenth year thereafter shall be reapportionment years.* The reapportionment commission shall be appointed and confirmed by March 1 of the reapportionment year, and shall file a reapportionment plan with the county clerk by December 31 of the reapportionment year.

> (e) The county clerk shall furnish all necessary technical and secretarial services for the reapportionment commission. The council shall appropriate necessary funds to enable the commission to carry out its duties.
>
> (f) The reapportionment commission shall be guided by the following criteria in establishing the boundaries of the council districts:
>
> > (1) No district shall be drawn to unduly favor or penalize a person or political faction;
> >
> > (2) Insofar as possible, districts should be contiguous and compact;
> >
> > (3) District lines shall, where possible, follow permanent and easily recognizable features;
> >
> > (4) *Districts shall have approximately equal resident populations as required by applicable constitutional provisions.*
>
> (g) The district boundaries as established by the reapportionment commission shall be in effect at the first regularly scheduled council election following the filing of the plan and for any subsequent council election. The district boundaries in effect prior to the filing of the reapportionment plan shall remain in effect during the duration of the term of all councilmembers elected or appointed to represent such districts until the expiration of the full term of such councilmembers, including any election held to fill an unexpired term under section 3–4.

Charter of the County of Hawaii § 3–17 (1990) (emphases added).

should exclude therefrom nonresident college students and nonresident military personnel and their dependents. The Commission adopted a reapportionment plan (the Commission's plan) and filed it as required with the County Clerk. The Commission's plan provided for a total resident population base that included nonresident college students and nonresident military personnel and their dependents.

Subsequent to the filing of the Commission's plan, Plaintiffs–Appellants Citizens for Equitable and Responsible Government, Brenda J. Ford, Stanley A. Boren, Floyd H. Lundquist, Marlene E. Lundquist, Ronald C. Phillips, (collectively, Appellants) and Plaintiffs–Appellees Beverly Byouk and Sandra W. Scarr filed a Complaint and First Amended Complaint against County of Hawai'i and other Defendants–Appellees, the County Clerk, Hawai'i County and Llyod Van De Car, Chairman of the Commission (collectively, County Appellees) in the third circuit court (the court)[2] requesting, *inter alia*, a declaratory ruling that the Commission's plan was invalid.

Appellants moved for partial summary judgment on the ground the Commission used the wrong population base and that, therefore, the Commission's plan was unconstitutional because its total deviation from the ideal mean exceeded 10%. Appellants appended to their motion for summary judgment a letter dated October 25, 1989, written by Christopher J. Yuen (Yuen), the attorney representing the Commission during the drafting of the reapportionment plan, for the proposition that the Commission was advised to use the same population base as used by the State Reapportionment Commission. On June 20, 2002, County Appellees filed an affidavit by Yuen to rebut Appellants' proposition. Appellants moved to strike the affidavit.

Following a hearing, the court denied Appellants' motion and *sua sponte* granted partial summary judgment in favor of County Appellees. The court did not issue findings of fact or conclusions of law, but in its July 19, 2002 order stated, *inter alia*, as follows:

The [c]ourt finds that the adoption by the ... Commission of a resident population base which did not exclude non-resident military personnel and their dependents and did not exclude non-resident university students in the 2001 council redistricting plan was proper.

The [c]ourt also finds that there was no unconstitutional deviation in the population count in the county council districts as set forth in the 2001 council redistricting plan adopted by the ... Commission.

Following the court's ruling, the parties agreed to withdraw all remaining counts so that final judgment could be entered in the case.[3] The court entered final judgment in favor of County Appellees and against Appellants on January 24, 2003. Appellants filed their notice of appeal on January 31, 2003.

## II.

On appeal, Appellants maintain that the court erred in (1) refusing to strike the affidavit of the Commission's counsel, (2) concluding that the Commission could include nonresident university students and nonresident military personnel and their dependents in the population base, (3) deciding that the total deviation between county council districts in the redistricting plan did not exceed constitutional limits, and (4) ruling that the redistricting plan is valid. They request an order (1) invalidating the Commission's plan, (2) appointing a master to prepare a new redistricting plan using the correct population base, and (3) granting such other appropriate relief.

## III.

 "Unlike other appellate matters, in reviewing summary judgment decisions[,] an appellate court steps into the shoes of the

---

**2.** The Honorable Riki May Amano presided.

**3.** The effect of the parties' stipulation to amend the first amended complaint and for entry of judgment, was "to withdraw [Appellants'] allegations that the ... Commission failed to use a 'rational or objective methodology'... and wrongfully submerged communities of interest into larger districts but not [Appellants'] allegations as to the population base that the ... Commission used."

trial court and applies the same legal standard as the trial court applied." *Beamer v. Nishiki,* 66 Haw. 572, 577, 670 P.2d 1264, 1270 (1983). "Summary judgment is appropriate if the pleadings, depositions, and answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." *Pac. Int'l Serv. Corp. v. Hurip,* 76 Hawai'i 209, 213, 873 P.2d 88, 92 (1994). A trial court's conclusions of law are reviewed *de novo* under the right/wrong standard. *Fujimoto v. Au,* 95 Hawai'i 116, 137, 19 P.3d 699, 720 (2001). Under this standard, the trial court's conclusions of law are not binding upon the appellate court and are freely reviewable for its correctness. *Id.*

## IV.

As to point (1), the court did not rule on Appellants' request to strike an affidavit of the Commission's attorney. Appellants assert that the affidavit of the Commission's attorney is not part of the Commission's records and contains the opinion and recollection of the attorney ten years after-the-fact. County Appellees maintain that they offered the affidavit of the Commission's attorney to clarify that the letter in Appellants' motion stated only that there was a difference in reapportionment between using residents, as opposed to registered voters, in determining the population base and that the affidavit was not introduced to reflect the intent of the charter commission.[4] Inasmuch as the affidavit was not offered with respect to the intent of the charter commission and is not necessary to our interpretation of the phrase "resident populations," *see infra,* we do not address Appellants' point (1).

## V.

■ The primary issue on appeal, Appellants' point (2), is whether nonresident college students and nonresident military personnel and their dependents should be excluded from the population base of Hawai'i County's reapportionment of city council districts. The Charter mandates that "[d]istricts shall have *approximately equal resident populations* as required by applicable constitutional provisions[,]" Charter § 3–17(f)(4) (emphasis added), *see supra* note 1, but fails to define the phrase "resident populations."

Appellants first argue that "resident populations" should be interpreted in the same manner as that term is applied in the apportionment of state representative districts, that is, by using a permanent resident population base. Appellants refer to an amendment made to Article IV of the Constitution of the State of Hawaii in 1992, when voters statewide voted to use a "permanent resident" population base for apportioning legislative districts. The amendment mandated that only residents having their domiciliary in the State of Hawai'i may be counted in the population base for the purpose of reapportioning legislative districts. Article IV of the Constitution of the State of Hawaii states in relevant part as follows:

> The commission shall allocate the total number of members of each house of the state legislature being reapportioned among the four basic island units namely: (1) the island of Hawaii, (2) the islands of Maui, Lanai, Molokai and Kahoolawe, (2) the island of Oahu and all other islands not specifically enumerated, and (4) the islands of Kauai and Niihau, *using the total number of permanent residents in each of the basic island units* and computed by the method known as the method of equal proportions; except that no basic island unit shall receive less than one member in each house.

Haw. Const. art. IV, ·§ 4 (amended 1992) (emphasis added). However, the amendment to Article IV only applies to state legislative redistricting, not county council redistricting.

The Commission interpreted the Charter phrase "resident populations" to encompass

---

4. Yuen's affidavit states that "in drafting the charter language which provides that districts should have 'approximately equal resident populations as required by applicable constitutional provision' the intent was that the degree of equality *only be as constitutionally mandated.*" (Emphasis added.) This reference to the charter commission's "intent" merely confirms what is stated in the criteria in Charter section 3–17(f).

all persons who *"reside* within the county" as reflected in the federal census and, accordingly, did not exclude nonresident university students and nonresident military personnel and their dependents in the population base for the reapportionment plans. County Appellees argue that the Commission's interpretation of the phrase was a discretionary act, and, thus, under *Kawamoto v. Okata,* 75 Haw. 463, 868 P.2d 1183 (1994), the actions of the Commission should be accepted unless an abuse of discretion is shown.

■ "The interpretation of the charter is similar to the interpretation of a statute." *Maui County Council v. Thompson,* 84 Hawai'i 105, 106, 929 P.2d 1355, 1356 (1996). When interpreting a statute,

> our foremost obligation is to ascertain and give effect to the intention of the legislature[,] which is to be obtained primarily from the language contained in the statute itself. *And where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning.*

*Id.* (quoting *State v. Baron,* 80 Hawai'i 107, 113, 905 P.2d 613, 619 (1995)) (emphasis added). In this regard, a common definition of "resident" is

> [a]ny person who occupies a dwelling within the State, has a *present intent to remain within the State for a period of time, and manifests the genuineness of that intent* by establishing an ongoing physical presence within the State together with indicia that his presence within the State is *something other than merely transitory in nature.*

*Black's Law Dictionary* 1309 (6th ed.1990) (emphases added). *See In re Irving,* 13 Haw. 22, 24 (1900) ("[T]he primary significance of the word 'residence' as used in the constitution is the same as domicil[e]—a word which means the place where a man establishes his abode, makes the seat of his property, and exercises his civil and political rights." (Quoting *Chase v. Miller,* 41 Pa. 403, 420 (Pa.1862))). This definition of "resident" would exclude any person who did not exhibit a present intent to remain within Hawai'i County for more than a transitory period.

Generally, college students from outside Hawai'i County who lack a present intent to remain in the county for a period of time beyond their date of graduation would not be considered residents. Their presence in Hawai'i County is primarily for educational purposes, which is "transitory in nature." Likewise, ordinarily the transitory nature of military personnel from outside Hawai'i County is apparent. Normally, military personnel and their dependents are temporarily stationed in the county by the United States military. Military personnel may have little say in deciding the location of their assignment. As a result, generally speaking, members of the military are in Hawai'i County involuntarily, as opposed to persons who choose to live in the county. *See Carpenter v. Hammond,* 667 P.2d 1204, 1211 (Alaska 1983) (recognizing the "involuntary nature of the military member's assignment to [a] state").

The Charter employs the phrase "resident populations" which indicates that the drafters of the Charter intended to limit the population base to residents of Hawai'i County. Those who live in the county temporarily for educational purposes or those who live in the county involuntarily because ordered to do so would seemingly lack a present intent to remain in the county, rendering their stay "transitory in nature." [5] Logically, the drafters of the Charter would not have modified the word "population" by the adjective "resident" or, on the other hand, would have employed the phrase "total population" had they intended to include nonresident college students and nonresident military personnel and their dependents in the population base.

Accordingly, we hold that the phrase "resident populations" found in the Charter excludes nonresident university students and nonresident military personnel and their dependents from the population base of the county council reapportionment plan. The

---

5. Obviously, a person who otherwise ostensibly falls within such categories but establishes a present intent to remain in the county and exhibits indicia that his or her presence is something other than merely transitory may establish resident status. *See Black's Law Dictionary* at 1309.

court, therefore, was wrong to conclude that the Commission's inclusion of these nonresidents was proper.[6]

### VI.

While we must interpret the term "resident populations," we note that no dispute is raised by the parties as to whether the persons designated as residents or nonresidents were properly denominated as such. Appellants note that "in 2001, State officials had access to an improved database and software program and had the ability to collect data that enabled state officials to identify and locate nonresident students, nonresident military personnel and nonresident military dependents with reasonable accuracy." (Emphases omitted.) Thus, argue Appellants, "[i]t was also possible to identify these same individuals for the purpose of establishing county council seats for the County of Hawaii County Council."

County Appellees do not deny the availability of such technology nor challenge its feasibility. In fact, they apparently relied on the State's database and computer program to support their motion for partial summary judgment. In an affidavit attached as "Exhibit D" to County Appellees' motion for partial summary judgment, David J. Rosenbrock, data processing coordinator for the State of Hawai'i Office of Elections, stated that "his office provided population data to the County of Hawaii Reapportionment Commission," derived from "the federal census, the United States Military and from the University of Hawaii at Hilo." Attached as "Exhibit 1" to the affidavit were three charts showing (1) total population with no extractions, (2) total population with nonresident students and nonresident military personnel extracted, and (3) total population with nonresident students, nonresident military personnel and their dependents extracted. The third chart expressed a deviation of 10.893%.

The difference in population bases between the first chart, showing a total population of 148,677, and the third chart, showing a total population minus nonresidents of 147,806, confirms Appellants' calculation in their opening brief that using information from the Commission's computer database, 871 "nonresidents ... should have been excluded from the population base." County Appellees do not raise any objection to this.

### VII.

We observe further that the exclusion of identifiable nonresidents from the population base is consistent with the rules for determining "residency" for election purposes under Hawaii's state election law, Hawai'i Revised Statutes (HRS) chapter 11. HRS chapter 11 governs "all elections, primary, special primary, general, special general, special, or *county.*" HRS § 11–3 (1993) (emphasis added). Pursuant to HRS § 11–11 (1993), the "county clerk shall be responsible for voter registration in the respective counties and the keeping of the general register and precinct lists within the county." HRS § 11–13 (1993) provides seven rules for determining a person's "residency" for voter registration purposes. The statute references students as well as military personnel as follows:

(5) A person does not gain or lose a residence solely by reason of the person's presence or absence *while employed in the service of the United States or of this State, or while a student of an institution of learning,* or while kept in an institution or asylum, or while confined in a prison;

(6) No member of the armed forces of the United States, the member's spouse or the member's dependent is a resident of this State solely by reason of being stationed in this State[.]

---

6. Inasmuch as we determine the phrase "resident populations" to be plain and unambiguous, we need not examine the 1990 charter commission's records to ascertain the county electors' intent in adopting the phrase. In any event, Appellants maintain that aside from evidence that the charter commission "clearly rejected the use of 'registered voters' as a base because that provision was already under [legal] attack[,] ... [t]he rest of the charter commission's records is silent." County Appellees do not cite to the charter commission's records to support the Commission's interpretation. Hence, there is no instructive "legislative" history concerning the term "resident populations."

HRS § 11–13. The Commission, by relying on "the census-counted population," included persons in the population base "solely by reason of the person's presence" in Hawaiʻi County "while employed in the service" or "while a student of an institution of learning[.]" This counting of students and military personnel and their dependents based on mere presence alone conflicted with the statutorily mandated process for determining who may register to vote among the counties. The plain reading of *"resident* populations" avoids the anomalous result of counting nonresidents in the reapportionment plan when those nonresidents, pursuant to HRS § 11–13, cannot register to vote.

### VIII.

#### A.

In line with our holding, the Commission should have excluded the said nonresidents from the redistricting population base. However, Appellants do not argue that the use of the wrong population base alone invalidates the Commission's plan, but, rather, that the use of the wrong population base created an unconstitutional deviation. Even if Appellants had argued that the plan was void for being based on the wrong population, we observe that the language of Charter section 3–17(f)(4) would bring us back to the constitutional question. Section 3–17(f)(4) states that "[d]istricts shall have *approximately equal* resident populations *as required by applicable constitutional provisions.*" (Emphases added.) Thus, assuming Appellants' calculations, *infra,* are correct, we address Appellants' argument in points (3) and (4) that when nonresident military personnel, their dependents, and university students are excluded from the population base, "deviations emerge in the [r]edistricting [p]lan that exceed constitutional limits." We do not believe that that is the case, however.

#### B.

▮▮▮ The United States Supreme Court has held that the equal protection clause of the United States Constitution requires that

electoral representation "be apportioned on a population basis." *Reynolds v. Sims,* 377 U.S. 533, 568, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).[7] This requirement means "that a[s]tate [must] make an *honest and good faith effort* to construct districts . . . as nearly of equal population as is *practicable.*" *Kawamoto,* 75 Haw. at 470, 868 P.2d at 1187 (quoting *Reynolds,* 377 U.S. at 577, 84 S.Ct. 1362 (emphases added)). The Court recognized, however, that "[m]athematical exactness or precision is hardly a workable constitutional requirement." *Reynolds,* 377 U.S. at 533, 84 S.Ct. 1362. *See Kawamoto,* 75 Haw. at 474, 868 P.2d at 1189. Accordingly, it adopted a flexible, "case-by-case" approach to assessing redistricting plans, providing "general considerations" as follows:

> A[s]tate may legitimately desire to *maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designating a legislative apportionment scheme.* Valid considerations may underlie such aims. Indiscriminate districting, without any regard for *political subdivision or natural or historical boundary lines,* may be little more than an open invitation to partisan gerrymandering. Single-member districts may be the rule in one [s]tate, while another [s]tate might desire to achieve some flexibility by creating multimember or floterial districts. *Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the [s]tate.*
>
> . . . .
>
> So long as the divergences from a strict population standard are based on *legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible* with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature.

7. *Reynolds* is the "seminal decision in defining the 'one man, one vote' doctrine[.]" *Calderon v.*

*Los Angeles,* 4 Cal.3d 251, 93 Cal.Rptr. 361, 481 P.2d 489, 491 (1971).

*Reynolds,* 377 U.S. at 578–79, 84 S.Ct. 1362 (emphases added). *See Swann v. Adams,* 385 U.S. 440, 443–44, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967) (reversing a decision upholding a reapportionment plan where the state failed to present, and the district court failed to articulate, "acceptable reasons for the variations" of 30% among senate districts and 40% among house districts).

■ The "general principle of population equality ... applies to state and local elections[.]" *Abate v. Mundt,* 403 U.S. 182, 185, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971). The Supreme Court has intimated that "slightly greater percentage deviations may be tolerable for local government apportionment schemes" and that "particular circumstances and needs of a local community as a whole may sometimes justify departures from strict equality." *Id. See id.* at 186–88, 91 S.Ct. 1904 (upholding a county reapportionment plan with a total deviation of 11.9% and districts that exactly correspond to the county's five towns "based on the long tradition of overlapping functions and dual personnel" in the county government and "on the fact that the plan ... [did] not contain a built-in bias tending to favor particular political interests or geographic areas").

In view of these considerations, ... minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State. [Supreme Court] decisions have established, as a general matter, that *an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations. A plan with larger disparities in population, however, creates a pri-*

ma facie case of discrimination and therefore must be justified by the [s]tate.

*Brown v. Thomson,* 462 U.S. 835, 842–43, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983) (internal quotation marks and citations omitted). *See Kawamoto,* 75 Haw. at 474, 868 P.2d at 1189.

■ At issue in *Brown* was a Wyoming reapportionment plan that allocated one of sixty-four seats in the state's house of representatives to a county with a deviation of 60% below the mean. *Id.* at 837, 843, 103 S.Ct. 2690. Nevertheless, the Supreme Court upheld the plan on the following bases: (1) it was "undisputed" that Wyoming's policy of ensuring that each county had one representative was "free from any taint of arbitrariness or discrimination"; (2) "population equality [was] the sole other criterion used"; and (3) "there [was] no built-in bias tending to favor particular political interests or geographic areas." *Id.* at 843–44, 103 S.Ct. 2690. The *Brown* majority approved of the Wyoming plan as "an unusually strong example of an apportionment plan the population variations of which [were] entirely the result of the consistent and nondiscriminatory application of a legitimate state policy." [8] *Id.* at 844, 103 S.Ct. 2690. Thus, the "ultimate inquiry" is to determine "whether the legislature's plan may reasonably be said to advance a rational state policy and, if so, whether the population disparities among the districts that have resulted from the pursuit of this plan *exceed constitutional limits.*" *Id.* at 843, 103 S.Ct. 2690 (internal quotation marks, brackets, and citation omitted) (emphasis added).

## IX.

### A.

■ The Commission's plan divides Hawai'i County into nine districts. Using the

---

**8.** The *Brown* majority noted that the appellants "limited their challenge to the alleged dilution of their voting power resulting from the one representative given to" the subject county and, therefore, the issue was "not whether a 16% average deviation and an 89% maximum deviation ... [was] constitutionally permissible." 462 U.S. at 846, 103 S.Ct. 2690. Hence, the *Brown* majority believed it was "not required to decide whether Wyoming's nondiscriminatory adherence to county boundaries justifie[d] the population deviations," *id.,* which is the second prong of the two-part "ultimate inquiry"—whether the popu-

lation disparities among the districts exceed constitutional limits. However, Justice Brennan, authoring the dissenting opinion in *Brown,* in which three justices joined, agreed that "Wyoming's long-standing policy of using counties as the basic units of representation [was] a rational one," but maintained that the deviations in Wyoming's plan, "even if justified by state policy, [were not] within the constitutionally tolerable range of size." *Id.* at 853, 103 S.Ct. 2690 (Brennan, J., dissenting, joined by White, Marshall, and Blackmun, JJ.).

"resident population" base (excluding nonresident military personnel, their dependents, and university students) of 147,806, propounded by Appellants, the ideal mean is 16,423 (147,806 divided by nine). According to Appellants' briefs and the record, the difference between the ideal mean and the actual "resident population" of each district represents that district's "deviation," which is translated into a deviation percentage. The difference between the district with the resident population that exceeded the ideal mean by the greatest percentage and the district with the resident population that fell below the ideal mean by the greatest percentage constitutes the redistricting plan's "total deviation." According to Appellants' calculations, the resident population of District 2 was 6.20% below the ideal mean (the latter category) and the resident population of District 8 was 4.69% above the ideal mean (the former category), thereby resulting in a total deviation of 10.89%.[9] County Appellees do not concede that there is such a deviation, maintaining that "[a]ny deviation is the result of the artificial construct of the Appellants in determining that the numbers they believe should have been used are the only correct numbers, when it was clearly within the discretion of the [C]ommission to use the numbers which it did use."[10] However, as stated *supra*, to support their motion for partial summary judgment, County Appellees submitted the Rosenbrock affidavit, which arrives at the same 10.89% figure as the total deviation when nonresident students and nonresident military and their dependents are excluded from the total population.

**B.**

Using Appellants' deviation figure for our analysis, a total deviation of 10.89% exceeds the Supreme Court's threshold and, therefore, creates a prima facie case of discrimination in violation of the equal protection clause. The Supreme Court of Arkansas has addressed a county plan with a total deviation similar to the deviation of the Commission's plan here. In *Riley v. Baxter County Election*, 311 Ark. 273, 843 S.W.2d 831, 832–33 (1992), all parties stipulated that the Baxter County redistricting plan varied among the districts by 10.149%. In assessing whether a "rational policy to justify a variance over 10%" existed, *id.* at 833, the Arkansas Supreme Court acknowledged the "systematic approach" taken by the election commission. The commission had divided "the total population" of Baxter County by eleven, the number of districts to be apportioned.

"The districts with population already closest to that number were kept the same, and the others were slightly modified, taking geography into account, to reach parity." *Id.* At the hearing before the trial court, a commission member testified that "the overriding principle" followed by the commission in redistricting "was equal representation." *Id.* The Arkansas Supreme Court concluded that the commission's "systematic approach ... reveal[ed] a rational policy of redistricting in Baxter County" and that "the 10.149% variance [was] only slightly over the acceptable 10% variation." *Id.* Thus, it was held that the trial court did not err in finding that

9. In their opening brief, Appellants list the nine "Land Districts" as "North Hilo, South Hilo, Puna, Kau, South Kona, North Kona, South Kohala, North Kohala, and Hamakua." They calculate the differences between total population and total population less nonresidents as follows: –11 in North Hilo, –810 in South Hilo, –28 in Puna, –6 in Kau, –6 in South Kona, –5 in North Kona, –5 in South Kohala, and no change in North Kohala and Hamakua.

Appellants also contend that "the 'permanent residents' population base for *State* legislative districts on the island is *147,806* persons ... and the 'resident populations' base for *county* council districts on the island is *148,677* ..., a difference of 871 persons." (Emphases in original.) They argue that "871 is a statistically significant num-

ber in this case because most of these individuals reside in a single council district."

In contrast, County Appellees point out the following:

For [D]istrict 8, the .286% above 5% is equivalent to about 47 persons. For [D]istrict 2, the difference of .607% above 5% is equivalent to 100 persons. Thus, even if Appellants' population base were accepted as the only required base, the presumption of constitutionality could be achieved by shifting this small number of persons—less than 200 persons in a population of over 147,000.

10. Using County Appellees' "total" population base, the deviation between District 6, with the lowest population, and District 9, with the highest population, is 8.62%.

the commission overcame the prima facie case of discrimination. *Id.*

Similarly here, the 10.89% total deviation of the Commission's plan is "only slightly over the acceptable 10% variation." *Id.* It is true, as Appellants posit, that the Commission did not address the deviation question because it was working from the "total" as opposed to "resident" population base, which presented only an 8.62% deviation. However, we cannot say that no rational basis underlay the 10.89% deviation because, akin to the approach exemplified by the commission member's testimony in *Riley,* the Commission in the instant case, by using "total" population, evidenced an intent to achieve inclusiveness and equal representation. *Cf. Calderon v. Los Angeles,* 4 Cal.3d 251, 93 Cal.Rptr. 361, 481 P.2d 489, 493 (1971) ("Adherence to a *population* standard, rather than one based on registered voters, is more likely to guarantee that those who cannot or do not cast a ballot may still have some voice in government." (Emphasis added.)).

For at the second meeting of the Commission, Commissioner Mark Van Pernis made a motion to "include all people": "[A]ll the people that the census counted is included because, whether they vote or not, or whether they're young or old, or military or not, they all use county services, they all pay taxes in some form or shape and they all need representations." The motion was put to a vote and carried, evidencing that the Commission was motivated by inclusiveness as opposed to a discriminatory purpose.

Importantly, the Charter required the Commission to consider three additional factors in redistricting. In addition to the "approximately equal resident populations" requirement at issue here, Charter section 3–17(f) required the Commission to consider the following criteria:

(1) No district shall be drawn to unduly favor or penalize a person or political faction;

(2) Insofar as possible, districts should be contiguous and compact;

(3) District lines shall, where possible, follow permanent and easily recognizable features; . . . .

These considerations governed the Commission's determination. The statements *supra* at the second meeting of the Commission evidenced the Commission's commitment against favoring or penalizing a person or political faction in consonance with Charter Section 3–17(f)(1).

Ultimately, the deviation stemming from a "pure population" standard resulted from the Commission's commitment to an inclusive model rather a discriminatory one. Appellants do not contend that the Commission failed to consider other redistricting criteria under the Charter or that such criteria would not support a slightly greater deviation than the 10% prima facie threshold. It should be noted that related objections were apparently waived when Appellants stipulated to withdraw the claims that the Commission failed to use a "rational or objective methodology" and "wrongfully submerged communities of interest into larger districts," *see supra* note 3, thereby abandoning any claim that the Commission incorrectly applied the other three criteria in Charter section 3–17(f).

Finally, we observe that Appellants do not argue, nor point to evidence in the record, that the Commission did not "make an honest and good faith effort to construct districts . . . of equal population as is practicable[,]" *Reynolds,* 377 U.S. at 577, 84 S.Ct. 1362 that the plan has " 'a built-in bias tending to favor particular political interests or geographic areas[,]' " *Brown,* 462 U.S. at 844, 103 S.Ct. 2690 (quoting *Abate,* 403 U.S. at 187, 91 S.Ct. 1904), or that the Commission's redistricting process was "taint[ed]" with "arbitrariness," *id.* at 843, 91 S.Ct. 1904. What remains is Appellants' conclusory statement that the "Commission's records do not reflect any evidence that justifies the [C]ommission's action to adopt a[r]edistricting [p]lan that has deviations that exceed the ideal mean by more than 10%." Therefore, on the foregoing bases and under the specific circumstances of this case, we hold that, ultimately, the court did not err in concluding that "there was no unconstitutional deviation in the population count in the county council districts as set forth in the 2001 council redistricting plan adopted by the . . . Commission."

## X.

Based on the foregoing, the Commission's erroneous inclusion of nonresident students and military personnel and their dependents in the population base for reapportionment of Hawai'i County council districts did not ultimately result in an unconstitutional deviation under its reapportionment plan. Although we do not agree with the court that the Commission's population base was correct, we affirm the court's decision upholding the Commission's plan because the plan complies with the mandate of Charter section 3–17(f)(4) that the districts be comprised of "*approximately equal* resident populations as required by applicable *constitutional provisions*." (Emphases added.) *See Hawaii Providers Network, Inc. v. AIG Hawaii Ins. Co.*, 105 Hawai'i 362, 368 n. 14, 98 P.3d 233, 239 n. 14 (2004) ("[W]here the decision below is correct it must be affirmed by the appellate court though the lower tribunal gave the wrong reason for its action." (Quoting *Agsalud v. Lee*, 66 Haw. 425, 430, 664 P.2d 734, 738 (1983).)); *Poe v. Hawai'i Labor Relations Bd.*, 87 Hawai'i 191, 197, 953 P.2d 569, 575 (1998) ("Where the circuit court's decision is correct, its conclusion will not be disturbed on the ground that it gave the wrong reason for its ruling." (Quotation marks and citation omitted.)). Accordingly, the court's January 24, 2003 final judgment is affirmed.

Concurring and Dissenting Opinion by NAKAYAMA, J. in which MOON, C.J., Joins.

I respectfully dissent from the majority's holding that the reapportionment plan for the County of Hawai'i (County), as crafted by the 2001 County of Hawai'i Reapportionment Commission (Commission), presents no equal protection violation.

As the majority notes, a reapportionment plan that exhibits a total population deviation of more than ten percent presumptively violates the right to equal representation secured under the fourteenth amendment to the United States Constitution. *Brown v. Thomson*, 462 U.S. 835, 842–843, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983) (citing *Swann v. Adams*, 385 U.S. 440, 444, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967)). That presumption of illegality may only be dispelled by showing that rational public policies outweigh the ill effects of an apportionment scheme that materially enhances the representational power of some at the expense of others. *Mahan v. Howell*, 410 U.S. 315, 326, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973).

The Commission's reapportionment plan in this case is presumptively unconstitutional under *Brown v. Thomson* because it reflects a total population deviation of 10.89 percent. The excessive deviation was caused by the Commission's error in counting non-resident students and military personnel when calculating the ideal mean population for each of the voter districts.

I part company with the majority because the heightened deviation flowing from that error cannot, as *Mahan v. Howell* requires, be rationalized under any public policy the Commission was authorized to pursue. Section 3–17(f) of the Hawai'i County Charter (Charter)—which enumerates the *only* public policies the Commission may validly consider in fashioning district boundaries—states:

(1) No district shall be drawn to unduly favor or penalize a person or political faction;

(2) Insofar as possible, districts should be contiguous and compact;

(3) District lines shall, where possible, follow permanent and easily recognizable features;

(4) Districts shall have approximately equal resident populations as required by applicable constitutional provisions.

Charter of the County of Hawai'i § 3–17(f) (1990). Inasmuch as subsection (4), under our interpretation today, forbids the inclusion of non-resident students and military personnel in the "resident population" count, the Charter's stated policy is to exclude these groups from the Commission's redistricting calculus. To allow the Commission to surreptitiously establish the district boundaries based on where these excluded groups reside—in short, to employ, *de facto*, a "total population" count such as that used in this case—undermines subsection (4)'s fundamental purpose of equalizing the populations

among the districts without regard to non-resident students and military personnel.

Because no authorized public policy justifies the erosion of equal representation that the current plan engenders, the plan fails the constitutional test set forth in *Brown v. Thomson* and *Mahan v. Howell.* Accordingly, I must dissent.[1]

## MOTION FOR RECONSIDERATION

LEVINSON, ACOBA, and DUFFY, JJ.; With NAKAYAMA, J., Dissenting, With Whom MOON, C.J., Joins.

Plaintiffs–Appellants Citizens for Equitable and Responsible Government, Brenda J. Ford, Stanley A. Boren, Floyd H. Lundquist, Marlene E. Lundquist, and Ronald C. Phillips (collectively, Appellants) filed a motion for reconsideration (the motion) of this court's July 22, 2005 published opinion (the opinion), in which a majority of this court affirmed the decision of the circuit court of the third circuit (the court) to uphold the reapportionment plan of the County of Hawaii 2001 Reapportionment Commission (the Commission). *Citizens for Equitable & Responsible Gov't,* at 329, 120 P.3d at 228.

### I.

In the motion, Appellants argue that (1) this court cannot substitute its findings for that which the Commission and the court should have, but did not, make, (2) this court cannot refer to the public testimony of Julie Jacobson, a person who is not a member of the Commission, as evidence of the Commission's unarticulated intent, (3) this court's substituted justification for deviations in excess of 10% is no justification at all, (4) lack of good faith and honesty was subsumed in Appellants' assignment of error, (5) the plan is invalid if the plan is constitutionally defective, and (6) this court's conclusion that the court and the Commission erred in using the wrong population base, means that it should simply reverse the court's judgment. Accordingly, Appellants request that this court (1) strike any reference to Jacobson's testimony, (2) strike all references to the purported justification of the Commission for offering a plan with deviations in excess of 10%, (3) reverse the court's judgment, and (4) invite the parties to submit further pleadings as may be appropriate to the amended decision. For the reasons discussed herein, the motion for reconsideration is granted in part as to the reference to the Jacobson testimony, but denied in all other respects.[1]

### II.

■ Addressing first Appellants' second point, the challenge to Jacobson's testimony, Appellants maintain that this court "relie[d] upon the testimony of a person who is *NOT* a member of the Commission[, Jacobson,] to justify the … Commission's action below" and that "[s]uch reliance is inconsistent with" *Dines v. Pacific Insurance Co.,* 78 Hawai'i 325, 893 P.2d 176 (1995). (Capitalization and emphasis in original.) However, the opinion does not state that Jacobson was a member of the Commission, but identifies her as a Hawai'i County Councilmember. It may be assumed that Jacobson's testimony apprised the Commission of how using a total population base can achieve inclusiveness and equal representation. The opinion refers to Jacobson's testimony as follows:

> [W]e cannot say that no rational basis underlay the 10.89% deviation because, akin to the approach exemplified by the commission member's testimony in *Riley,* the Commission in the instant case, by using "total" population, evidenced an intent to achieve inclusiveness and equal representation.
>
> . . .
>
> For at the second meeting of the Commission, Hawai'i County Councilmember

---

1. The County notes that the reapportionment plan's total deviation figure could be brought below ten percent by shifting "less than 200 persons" to other districts. That remedy would seem the better course than the majority's proposal to hold in place a reapportionment plan that is based on an inaccurate population count.

1. Hawai'i Rules of Appellate Procedure Rule 40(b) (2005) provides that a motion for reconsideration "shall state with particularity the points of law or fact that the moving party contends the court has overlooked or misapprehended, together with a brief argument on the points raised."

Julie Jacobson testified in favor of "using the population as the basis for the districting," stating that,

> each human being has needs for the government serves [sic] and it doesn't matter if you're one day old, if you're 99 years old, if you vote or don't vote, or any other of those variables ... each person needs to be considered and I think especially with the complexity

of infrastructure issues, that we deal with, that's why it's important.

Opinion at 328, 120 P.3d at 227.[2]

Also, Appellants state for the first time in the motion that Jacobson later retracted the statement quoted in the opinion by rejecting the Commission's plan. It should be noted that Appellants did not challenge Jacobson's testimony in their reply brief, even though Defendants–Appellees, County of Hawai'i, County Clerk, County of Hawai'i, and Lloyd Van De Car, Chairman of the Commission (collectively, County Appellees), cited to Jacobson's testimony in their answering brief. Appellants, therefore, failed to raise Jacobson's supposed retraction of the quoted statement that they tardily do now.

However, it appears that Jacobson had recanted the quoted statement. Appellants state that at the Commission's final meeting on December 18, 2001, Jacobson "*rejected* her own statement." (Emphasis in original.) Upon review of the record on appeal, it appears that Jacobson's December 18, 2001 testimony was never made part of the record.[3] Appellants have since attached the subsequent Jacobson testimony to their motion as Appendix 32, as well as a declaration by their attorney, which certifies that the attached minutes "are public documents ... that are found on the County of Hawaii website at

Hawaii-county.com." Although the subsequent Jacobson testimony need not be considered by this court, *see Orso v. City & County of Honolulu*, 55 Haw. 37, 38, 514 P.2d 859, 860 (1973) ("[A] question involving evidence not in the record cannot be reviewed on appeal.") (citation omitted), in light of the fact that Jacobson retracted her statement, a fact only now raised by Appellants, this court grants Appellants' request to strike any reference to the Jacobson testimony.[4] In doing so we observe that it is a fundamental and elementary proposition that counsel is obligated to present an accurate record on appeal.

### III.

■ In their first point, Appellants argue that it is the "Commission's constitutional obligation, *not* this [c]ourt's burden, to offer evidence that justifies a plan that contains deviations in excess of 10%, that favor preexisting [c]ounty [c]ouncil districts and that 'fractures' the judicial district of Puna."[5] (Emphasis in original.) Appellants maintain that this court "overlook[ed] ... that officials in *Riley[v. Baxter County Election Commission*, 311 Ark. 273, 843 S.W.2d 831 (Ark. 1992),] actually testified to the court to explain their reason for offering a plan that contained deviations in excess of 10% [and that] ... [n]either the trial court nor the appellate court in *Riley* searched through the record to fathom the basis for official action."

To the contrary, this court did not "overlook" the fact that the commission member in *Riley* "actually testified" inasmuch as the opinion expressly states that "[a]t the hearing before the trial court, a commission member *testified* that 'the overriding principle' followed by the commission in redistricting

---

2. Appellants attach Jacobson's June 22, 2001 testimony to their motion as Appendix 31, but the testimony is already part of the record.

3. County Appellees attached excerpts from the December 18, 2001 transcripts to their memorandum in opposition to Appellants' motion for change of venue, but Jacobson's testimony on pages 9–13 was not included.

4. In their response to the motion, County Appellees maintain that Jacobson's testimony "was given at an earlier meeting of the Commission

before any particular plan was before it. She later spoke in support of a particular plan but did not specifically address the population issue. What she was clearly recanting was the plan she herself submitted to the Commission to consider." To remove any doubt regarding this matter, however, we believe the better course is to excise such testimony.

5. The argument that the redistricting plan "fractures" the judicial district of Puna is addressed *infra*, Part IV.

'was equal representation.'" Op. at 327, 120 P.3d at 226 (quoting *Riley*, 843 S.W.2d at 833) (emphasis added). The rule extrapolated from *Riley* was that a redistricting plan survives equal protection scrutiny where its variation is *"only slightly over* the acceptable 10% variation[,]" and "the commission's 'systematic approach ... reveal[s] a rational policy of redistricting.'" *Id.* (quoting *Riley*, 843 S.W.2d at 833) (emphasis added).

The opinion agrees with Appellants that "the Commission did not address the deviation question because it was working from the 'total' as opposed to 'resident' population base, which presented only an 8.62% deviation." *Id.* at 328, 120 P.3d at 227. But, it was decided that similar to *Riley*, "the 10.89% total deviation of the Commission's plan is 'only slightly over the acceptable 10% variation[,]'" *id.* at 328, 120 P.3d at 227, and *"akin* to the approach exemplified by the commission member's testimony in *Riley*, the Commission in the instant case, by using a 'total' population, evidenced an intent to achieve inclusiveness and equal representation." *Id.* at 328, 120 P.3d at 227. (emphasis added).

Even without the Jacobson testimony, which is stricken, Commissioner Mark Van Pernis's "motion to 'include all people,'" which was "put to a vote and carried, evidenc[ed] that the Commission was motivated by inclusiveness, as opposed to a discriminatory purpose." *Id.* Moreover, the opinion cites to three additional criteria for redistricting as mandated by section 3–17(f) of the Charter of the County of Hawaii (the Charter). *See id.* at 328, 120 P.3d at 227. As the opinion notes, "Appellants [did] not contend that the Commission failed to consider [these] other redistricting criteria under the Charter or that such criteria would not support a slightly greater deviation than the 10% prima facie threshold." *Id.*

Additionally, County Appellees, in their memorandum in opposition to the motion for reconsideration, now identify parts of the record as evidence that the Commission was guided by these other Charter-mandated criteria. First, the reapportionment plan itself reflects the Commission's consideration of the "permanent and easily recognizable features" criterion, Charter § 3–17(f)(3), inasmuch as the written descriptions of each of the designated council districts refer to streams, shorelines, and other geographical features.

Second, at their final meeting on December 18, 2001, the commissioners made statements that evidence serious consideration of all four criteria. One commissioner related the Commission's task of balancing the equal representation criterion with the other three criteria:

> Since the Big Island population is not equally spread out geographically throughout the Island, obviously the districts cannot be geographically equal in size, in addition to being numerically equal. That is why argument and controversy can result. *Some people or groups want a council district which serves their interest in a particular geographical area or a plan which serves their particular or geographical or political interest. But these localized special interests don't give adequate consideration to the rest of the Island.*
>
> *The Commission needs to consider all of the Island and all of its people in making the best plan. Such plans would spread around more fairly the benefits and detriments of equal-numbers but on equal geography.*

(Emphasis added.) Another commissioner expressed the Commission's motivation to adopt a plan ensuring that, consistent with the provisions of Charter sections 3–17(f)(1) and (2), "[n]o district shall be drawn to unduly favor or penalize a person or political faction" and that districts would be "contiguous and compact":

> I have no doubt in my mind that we did the very best we could with creating, you know, as *compact and as contiguous districts* as possible....
>
> So we did as a Charter mandate, we did the very best we could wherever possible to create a[sic] *compact and contiguous districts* as we could. We made concerted efforts to keep communities and subdivisions together. Again, here and there, there [sic] wasn't absolutely do-able because of the census tracts and numbers and all the other issues. But I have no

doubt in my mind that we did our very, very best.

. . . .

I have no doubt in my mind that *no specific group was penalized, and no specific group was favored,* we did the very best we could, all of the Island and all the communities.

(Emphases added.) Pursuant to *Riley,* these statements, made by the Commission members themselves, justify the slightly greater than 10% deviation.[6] Accordingly, this court did not "overlook" or "misapprehend" the *Riley* holding.[7]

## IV.

■■ In their third point, Appellants argue that while the Commission's reliance on the total population base "reflects the underlying principle of the one man—one

6. Hence, as County Appellees maintain, "it would be a futile exercise to remand to ask commissioners for a reason which they have already expressed in the vote on the motion at the June 22, 2001 meeting."

7. Inasmuch as the reapportionment plan and the commissioners' testimony are part of the record, this court may rely on these grounds to affirm the court's judgment. *See Delos Reyes v. Kuboyama,* 76 Hawai'i 137, 140, 870 P.2d 1281, 1284 (1994) ("This court may affirm a grant of summary judgment on any ground appearing in the record, even if the circuit court did not rely on it.").

8. Appellants argue as follows:

In offering *its* justification for the County Reapportionment Commission's plan (in substitution of the Commission's omission), this Court states that the Commission's purpose must have been to use a total population base that would give every man, woman, child, incarcerated felon, soldier, dependent of a soldier, resident alien and others "representation."

While this statement reflects the underlying principle of the one man—one vote doctrine, it does not describe a rational state policy. Nor does it explain how that state policy is in fact legitimately advanced by a plan that is prima facie unconstitutional because it violates that one man—one vote doctrine of keeping populations as equal as possible to avoid the danger of diluting votes.

The extension of this statement is that the one man—one vote principle allows an apportioning body to create legislative districts under which pre-existing districts (and the incumbents therein) are favored and that "frac-

vote doctrine, it does not describe a rational state policy" inasmuch as it "allows an apportioning body to create legislative districts under which pre-existing districts (and the incumbents therein) are favored and [to] 'fracture' well-known communities of interests because of *administrative convenience* [.]"[8] (Emphasis in original.)

Appellants' motion attempts to clarify what was obviously ambiguous in their appellate briefs—the possibly problematic effect of the redistricting plan on "communities of interest."[9] According to the motion, the redistricting plan allegedly "fractures" the "judicial" district of Puna:

[T]he judicial district of Puna with 31,307 countable people is "fractured" by assigning portions of "upper" Puna along with portions of the adjoining judicial district of

ture" well-known communities of interests because of *administrative convenience,* the only articulated reason found in the County Reapportionment Commission's records. No court has ever subscribed to such a conclusion.

(Emphases in original.) It should be noted that the opinion did not reference "every man, woman, child, incarcerated felon, soldier, dependent of a soldier, resident alien and others," as Appellants imply in the quote above. The opinion did not employ such a list. Indeed, Appellants stated as a point of error that "the 2001 County Reapportionment Commission should have used a population base that excluded nonresident *military personnel* and their dependents and nonresident *students,*" (emphases added), groups which the opinion did discuss.

9. Appellants contend that *"Table Two,* reproduced in Opening Brief, Appendix 25, shows how the judicial district of Puna with 31,307 countable people is 'fractured.' " (Emphasis in original.) But Table Two, without explanation, does not convey the specific contention that Puna was "fractured." In fact, Appellants did not utilize Table Two for this proposition. Appellants referenced Table Two on three occasions in their opening brief. The first and second references, stating that "[t]he consequence of not excluding these persons from the population base is set forth in Table One and Table Two," and that "[t]he statistical significance of the 810 nonresidents who are located in the District of South Hilo is shown in Table Two," were cryptic at best. In the third reference, Appellants utilized Table Two to "show[] the number of persons who fall below or above the ideal mean for each council district," not to point out that Puna was being "fractured."

South Hilo to County Council District # 3 and by assigning other portions of "upper" Puna along with all of the adjoining judicial district of Ka'u and portions of the non-adjoining, distant judicial district of South Kona to County Council District # 6. As a result, residents of Puna have one resident councilor and must "share" two councilors with other adjoining districts who may or may not be a resident of Puna. This is a classic example of *vote dilution* of residents of one district in favor of residents of other districts.

As a result, residents of the "upper" Puna, whose population may justify a single councilor of its own, find their interests submerged into the adjoining and distant judicial districts of South Hilo, Ka'u, and South Kona. More significantly, Council Districts # 1, 2, 3, and 4 are denominated by "Hilo interests," with a statistically significant number of non-resident students (who should have been excluded) in the judicial district of South Hilo.

(Emphasis in original.)

While this explanation may have raised a concern, Appellants withdrew these arguments in the January 6, 2003 stipulation to amend first amended complaint and for entry of judgment. The stipulation stated:

Plaintiffs and Defendants herein stipulate to the amendment of the First Amended Complaint filed here on March 6, 2002 as follows:

1. Plaintiffs withdraw and delete Paragraphs 12.a to 12.f;

2. Plaintiffs withdraw and delete Paragraphs 12.j to 12.n.

*The effect of the deletions is to withdraw Plaintiffs' allegations that the County of Hawaii 2001 Reapportionment Commission failed to use a "rational or objective methodology" (¶¶ 12.a to 12.f) and wrongfully submerged communities of interest into larger districts (¶¶ 12.j to 12.n) but not Plaintiffs' allegations as to the population base that the County of Hawaii 2001 Reapportionment Commission used (¶¶ 12.g to 12.i and 12.o to 12.p).*

As a result, the Order for Summary Judgment entered herein on the population base that the County of Hawaii 2001 Reapportionment Commission used disposes of all issues herein leaving no other issues left for decision.

(Emphasis added.) Specifically, the stipulation withdrew, *inter alia,* the following allegations:

### No Rational or Objective Methodology

12.e. When the public provided information and recommendations on the assignment of communities of interest to specific Council Districts that differed from the 1991 Council District boundaries and the Commission's fixed geographical "starting points," the Commission rejected the public's input and recommendations, continued to rely upon the existing 1991 Council District boundaries and its arbitrar[il]y fixed geographical "starting points" and justified its adoption of the 2001 Reapportionment Plan by using arbitrary and inconsistent criteria.

12.f. As a consequence, the Commission's 2001 Reapportionment Plan (1) keeps incumbents in Council Districts based on the 1991 Council District boundaries, despite changes in the population for the County of Hawaii since 1991, (2) *fractures existing communities of interest, and (3) dilutes the representative power of some communities of interest while inflating the representative power of other communities of interest.*

. . . .

### Submergence of Communities of Interests into Larger Districts Where Different Socio–Economic Interests Predominate

12.j. For more than 100 years, governmental units in Hawaii have used the traditional land districts of the Island of Hawaii, now known as the judicial districts, to organize government agencies and to administer government programs . . . .

12.k. These traditional land districts, or judicial districts, are the Districts of North Hilo, South Hilo, Puna, Ka'u, South Kona, North Kona, South Kohala, North Kohala and Hamakua[.]

12.l. Furthermore, distinct communities of interest have developed and exist

within these traditional land districts, or judicial districts.

12.m. Although the reapportionment principles in Articl IV, Section 6 of the Hawaii State Constitution state that a reapportioning body shall avoid "[w]here practicable, submergence of an area in a larger district wherein substantially different socio-economic interests predominate," the Commission did not identify or consider the socio-economic interests of communities that could be determined from public sources available to the Commission on subjects such as education, employment and poverty levels, or the effect of including communities of differing socio-economic interest into designated Council Districts.

12.n. As a consequence, even though reasonable and practicable alternatives existed and even though the public had provided the Commission with background information on the differing socio-economic interest of communities, the Commission rejected such alternatives and information and, using its arbitrary geographical "starting points" and 1991 Council District boundaries, submerged communities of interest in certain areas into a larger district wherein substantially different socio-economic interest predominate. This consequence is reflected in the Commission's action that:

(1) *divided communities in the upper (or northern) portion of the Puna judicial district and assigned those divided communities to two (2) separate Council Districts where substantially different socio-economic interest predominate* [.]

(Some emphases added and some in original.) As observed in the opinion, "[t]he effect of the parties' stipulation ... was 'to withdraw Appellants' allegations that the ... Commission failed to use a 'rational or objective methodology' ... *and wrongfully submerged communities of interest into larger districts*

but not Appellants' allegations as to the population base that the ... Commission used." Op. at 321 n. 3, 120 P.3d at 220 n. 3 (brackets omitted) (emphasis added).

Appellants' withdrawal of the argument that the redistricting plan submerges communities of interests into larger districts where different socio-economic interests predominate precludes a resurrection of that argument on appeal, especially on a motion for reconsideration. *See Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 114, 839 P.2d 10, 27 (1992) ("The purpose of a motion for reconsideration is to allow the parties to present new evidence and/or arguments that could not have been presented during the earlier adjudicated motion."); *Briggs v. Hotel Corp.*, 73 Haw. 276, 287 n. 7, 831 P.2d 1335, 1342 n. 7 (1992) ("We again remind litigants that a motion for reconsideration is not the time to relitigate old matters."). Hence the alleged "vote dilution" of Puna residents is not properly before this court, having been withdrawn by stipulation. This court, then, did not "overlook" the "fracturing" of the judicial district of Puna because it was not a part of the appeal.

■■■ As to Appellants' contention that "the only articulated reason found in the County Reapportionment Commission's records" was "administrative convenience," as discussed *supra*, it must be reiterated that (1) Commissioner Van Pernis's "motion to 'include all people,' " which was "put to a vote and carried, evidenc[ed] that the Commission was motivated by inclusiveness as opposed to a discriminatory purpose[,]" Op. at 328, 120 P.3d at 227 and (2) the opinion cites to three additional criteria for redistricting mandated by section 3–17(f) of the Charter required to be considered by the Commission. *See id.* at 328, 120 P.3d at 227. Moreover, the "administrative convenience" argument was not presented as a discernible legal argument in Appellants' briefs [10] and, hence, need not

---

**10.** At the end of their reply brief, Appellants stated that "[c]onvenience, not substantive law, dictated the outcome of the final Redistricting Plan." This statement did not establish that the Commission was guided by administrative convenience in creating legislative districts. Again, Appellants did not assert that the Commission

failed to consider the other valid criteria as mandated under the Charter. As the opinion observes, "related objections were apparently waived when Appellants stipulated to withdraw the claims that the Commission failed to use a 'rational or objective methodology' and 'wrongfully submerged communities of interest into

have been addressed. *Norton v. Admin. Dir. of the Court*, 80 Hawai'i 197, 200, 908 P.2d 545, 548 (1995) (disregarding a particular contention for lack of a "discernible argument in support of that position, in violation of Rule 28(b)(7) of the Hawai'i Rules of Appellate Procedure").

## V.

In their fourth point, Appellants disagree with this court's statement that "Appellants do not argue, nor point to evidence in the record, that the Commission did not 'make an honest and good faith effort to construct districts ... of equal population as is practicable[.]'" Op. at 328, 120 P.3d at 227 (citation omitted). Appellants assert in the motion that the lack of good faith and honesty argument was "subsumed" in their assignment of error and incorrectly assert that they "argued in their Opening Brief[11] ... [that the Commission] made no effort, even when informed of the risks that it was taking by using the wrong population base, [sic] the Commission proceeded anyway—because of administrative convenience, because it was too difficult and time-consuming to do otherwise."

The fact remains, however, that Appellants did not expressly make a "lack of good faith and honesty" argument. Moreover, even if this court were to accept Appellants' contention that such an argument was "subsumed" in its assignment of error, it would not alter this court's conclusion that "[w]hat remains is Appellants' conclusory statement that the 'Commission's records do not reflect any evidence that justifies the [C]ommission's action to adopt a [r]edistricting [p]lan that has deviations that exceed the ideal mean by more than 10%.'" Op. at 328, 120 P.3d at 227. Indeed, as County Appellees observe, the Commission's inclusion of the deviation charts in the reapportionment plan is "indicative of the good faith effort of the

Commission to achieve equal representation by keeping the deviations at no more than five percent."[12] Hence, this point is without merit.

## VI.

In their fifth argument, Appellants maintain that "[a]lthough this Court states that [Appellants] did not assert that the County Reapportionment Commission's plan is invalid, if the plan is constitutionally defective, the plan cannot be valid." But the opinion, in addition to pointing out that Appellants did not argue that the use of the wrong population base alone invalidated the Commission's plan, also observed that "[e]ven if Appellants had argued that the plan was void for being based on the wrong population, ... the language of Charter section 3–17(f)(4) would bring us back to the constitutional question." Op. at 325, 120 P.3d at 224. Accordingly, the opinion proceeds to address the question of whether, "when nonresident military personnel, their dependents, and university students are excluded from the population base, 'deviations emerge in the [r]edistricting [p]lan that exceed constitutional limits.'" *Id.* Thus, the opinion is in agreement with Appellants' contention that if the plan was constitutionally defective, it would be invalid. A majority of this court did "not believe that that [was] the case, however." *Id.* Such matters, then, were not "overlooked" or "misapprehended."

## VII.

Finally, Appellants argue that "[i]n the usual case, this Court would remand the case to the trial court for further proceedings[,]" but because "the trial judge is no longer sitting and the County Reapportionment Commission has been dissolved[,] ... this Court should simply reverse the trial court's judgment below[, and u]pon such reversal,

larger districts,' ... thereby abandoning any claim that the Commission incorrectly applied the other three criteria in Charter section 3–17(f)." Op. at 328, 120 P.3d at 227.

**11.** The term "convenience" first appeared in the reply brief, not the opening brief as Appellants

state, and it does not appear Appellants used the term "administrative convenience." *See supra* note 10.

**12.** Using the total population base, the deviation percentage of each district does not exceed 5% and, therefore, does not exceed the 10% threshold.

the parties may then apply to this Court for further relief as the circumstances may warrant." In light of the disposition herein, these matters need not be addressed, and in any event, appear irrelevant to the decision.

### VIII.

Therefore, based on the foregoing,

IT IS HEREBY ORDERED that the motion for reconsideration is granted as to the request to strike the reference to the Jacobson testimony, and, therefore, the paragraph beginning on line 12 from the top of page 22 [page 328, 120 P.3d page 227] of the opinion shall be amended by striking the words after "Commission" on line 12 through line 20 and striking the word "then" on line 21, leaving the sentence beginning on line 12 to read:

For at the second meeting of the Commission, Commissioner Mark Van Pernis made a motion to "include all people": "[A]ll the people that the census counted is included because, whether they vote or not, or whether they're young or old, military or not, they all use county services, they all pay taxes in some form or shape and they all need representations."

The Clerk of the Court is directed to incorporate the foregoing changes in the original opinion and take all necessary steps to notify the publishing agencies of these changes.

IT IS FURTHER ORDERED that the motion is denied in all other respects.

Dissenting Opinion by NAKAYAMA, J., in which MOON, C.J., Joins.

I write to emphasize that, in contrast to the majority's opinion, *Riley v. Baxter County Election Commission,* 311 Ark. 273, 843 S.W.2d 831 (Ark.1992), in no way supports the conclusion that the 2001 County of Hawai'i Reapportionment Commission (Commission) followed a "rational" redistricting policy that justifies what is otherwise an unconstitutional redistricting plan.

*Riley* is clearly distinguishable. At issue in that case was a county redistricting plan drawn by the election commission of Baxter County, Arkansas. Having relied on an accurate population count, the commission was aware that its plan, which exhibited a total

population deviation of 10.149 percent, was presumptively unconstitutional. *Id.* at 832.

When the plan's constitutionality was subsequently challenged, commission members stepped forward to justify the heightened population deviation. Testimony from those members indicated that, while endorsing the "overriding principle ... [of] equal representation," the commission also believed that the plan should "keep to the old district lines as much as possible to avoid inconveniencing the voters." *Id.* at 833. The rational policy of "voter convenience," proffered by the commission in formal testimony, thus justified the plan's incremental erosion of equal representation. *Id.*

*Riley* accordingly stands for the far from novel proposition that, where a redistricting plan's total population deviation exceeds 10 percent, the redistricting authority must step forward and articulate some rational justification for the deviation. *See Voinovich v. Quilter,* 507 U.S. 146, 161, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993). *Riley* does not address the far different factual situation at issue here, where a redistricting authority, in mistaken reliance on an inaccurate population count, formulates a redistricting plan that was never intended to be presumptively unconstitutional. Neither *Riley,* nor for that matter, any of the other cases cited by the majority, endorses the majority's contention that a presumptively unconstitutional redistricting plan may be "rationalized" when the redistricting authority, due to an unrealized computational error, *inadvertently* devises a plan that exhibits a total population deviation in excess of 10 percent.

The dearth of authority supporting that contention is unsurprising. The fourteenth amendment to the United States Constitution generally requires that a reapportionment plan's total population deviation be less than 10 percent to pass constitutional muster. *Brown v. Thomson,* 462 U.S. 835, 842–843, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983). Nonetheless, because "[m]athematical exactness or precision is hardly a workable constitutional requirement," *Reynolds v. Sims,* 377 U.S. 533, 577, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the fourteenth amendment tolerates a

**338**

limited degree of divergence "from a strict population standard," provided that the plan as a whole is "based on legitimate considerations incident to the effectuation of a rational state policy." *Id.* at 579. In other words, countervailing state interests may, at times, permit a less than numerically equal redistricting plan, and a reapportionment authority is not necessarily remiss in pursuing those interests at the expense of perfect numerical equality among the voting districts.

The foregoing framework for assessing the constitutionality of a redistricting plan pragmatically acknowledges that government must, in certain circumstances, be allowed to pursue redistricting policies that incidentally enhance the representational power of some members of the electorate at the expense of others. It was never intended to function as a curative device for excusing, after the fact, a reapportionment authority's gross computational errors or inadvertent methodological mistakes—especially where, as here, those missteps were solely responsible for tainting the redistricting plan with the presumption of unconstitutionality.

The right of equal representation is far too hard-won a liberty for its erosion to be justified so blithely. Accordingly, I must dissent.